THE PEOPLE OF THE STATE OF NEW YORK ex rel. HENRY J. DOSCHER, Respondent, *v.* HERBERT S. SISSON, as State Commissioner of Excise, and DAVID H. RALSTON, Special Deputy Commissioner of Excise for the Borough of Brooklyn, Appellants.

Second Department, November 30, 1917.

**Constitutional law — Laws of 1917, chapter 521, authorizing sus-**
**pension of privileges under liquor tax certificates constitutional**
**— holder of certificate suspended not entitled to new certificate.**

Chapter 521 of the Laws of 1917, authorizing the Excise Commissioner, with the Governor's approval, to suspend the privileges under liquor tax certificates and to prohibit sales in proximity to camps or barracks of State or Federal troops or of munition factories or plants, is constitutional, and where a certificate issued under subdivision 2 of section 8 of the Liquor Tax Law has been suspended, the holder thereof is not entitled to have a new certificate issued to him for the excise year beginning October 1, 1917.

APPEAL by the defendants, Herbert S. Sisson, as State Commissioner of Excise, and another, from an order of the county judge of Kings county, entered in the office of the clerk of said county on the 22d day of October, 1917 (after the return to a writ of certiorari sued out under Liquor Tax Law, section 27, subdivision 1), directing the issuance to relator of a liquor tax certificate for the excise year commencing October 1, 1917, and ending September 30, 1918, for premises 5401 Third avenue, borough of Brooklyn, upon filing the proper application and bond and payment of the required license fee, and awarding fifty dollars costs.

Relator's property is at the corner of Third avenue and Fifty-fourth street, Brooklyn. It is within three blocks of the Morse Dry Dock and Repair Company, which is outfitting and equipping government vessels. On its grounds are two camps of the New York National Guard. The E. W. Bliss Company, and other manufacturers of munitions, are equally near.

This appeal involves the constitutionality of the "Public Safety Law," entitled "An Act to provide for the public safety, peace and good order," being chapter 521 of the Laws

of 1917. It authorizes the Excise Commissioner, with the Governor's approval, to " suspend the privileges " under liquor tax certificates heretofore or hereafter issued, and to prohibit such sales in proximity to camps or barracks of State or Federal troops, or of munition factories or plants, or of places of manufacture or production of material used in the manufacture of munitions. The Commissioner is to act on the application of the local municipal authorities, but he must be himself of opinion that " the public peace, safety and good order " require this step. This statute took effect on its passage, May 16, 1917.

Complaints of liquor sales early came from the Morse Dry Dock and Repair Company to Special Deputy Ralston. Major-General Bell, in command of the headquarters, Easten Department, addressed a formal complaint to the mayor of New York regarding about forty liquor places within a radius of three or four blocks from the Morse and Bliss concerns.

On June fourteenth Mr. E. P. Morse, president of the Morse Company, wrote on this subject to the Secretary of the Navy. On June twenty-eighth Major-General Bell again wrote, repeating his requests to the mayor. On July 2, 1917, the mayor, under this new statute, applied to the Excise Commissioner for suspension of liquor sales within a mapped territory. After inspection of the locality in question, the Excise Commissioner, on July 17, 1917, made an order suspending the " privileges under liquor tax certificates heretofore issued and now outstanding," and prohibiting " the sale of alcoholic beverages during the period of the present war." Such restricted area extends from 100 feet north of the north line of Fifty-second street southerly to a line 100 feet south of the center of Sixtieth street, and westerly of a line 100 feet east of the easterly line of Third avenue.

This order was duly approved by the Governor.

Relator's certificates had been under section 8, subdivision 2, of the Liquor Tax Law for sale of liquors not to be drunk on the premises.

When, in September, relator presented an application for a certificate for the excise year beginning October 1, 1917, the Special Deputy Excise Commissioner declined to issue such

certificate because of the Excise Commissioner's order of July seventeenth. On application to the county judge under subdivision 1 of section 27 of the Liquor Tax Law (Consol. Laws, chap. 34; Laws of 1909, chap. 39) for a writ of certiorari to review this action, that judge granted the relief sought, and directed the issue of such certificate, by the order now under review.

*William R. Dorman,* for the appellants.

*Emanuel Celler* [*Meyer Kraushaar* with him on the brief], for the respondent.

*Meier Steinbrink,* for another relator similarly situated.

PUTNAM, J.:

The relator's liquor tax certificate, though a species of property (*Matter of Lyman,* 160 N. Y. 96), only ran to the end of the excise year. After expiration, the holder's right to renewal is not absolute and unqualified. For example, if in the meantime a church has been built nearby, the certificate will not be renewed (*Matter of Hering,* 196 N. Y. 218, before the amendment of 1911; Liquor Tax Law, § 23, subd. 2, as amd. by Laws of 1911, chap. 643, and Laws of 1915, chap. 654), as the right to traffic in liquors is subject to the higher uses of the neighboring property. The issuance of such a license cannot divest the Legislature of the power to protect the lives, health and safety of its citizens. These belong to that class of objects which demand the application of the maxim *salus populi suprema lex.* They are attained by such appropriate means as the legislative discretion may devise. " That discretion can no more be bargained away than the power itself." (*Beer Co.* v. *Massachusetts,* 97 U. S. 25, 33; *Fertilizing Co.* v. *Hyde Park,* Id. 659; *Stone* v. *Mississippi,* 101 id. 814.)

The Legislature lays restrictions for other causes than the vicinity of churches or schoolhouses. Liquors cannot be sold within a half mile of the West Point Military Academy (§ 30a, as added by Laws of 1911, chap. 762), or within 1,320 feet of the Plattsburgh encampment (§ 30b, as added by Laws of 1917, chap. 172). A power to restrict the number of licensed places in certain parts of a town or city (§ 8, as amd,

by Laws of 1917, chap. 623) is a feature of this law. Such territory and its bounds may be fixed and modified by local ordinance or resolution. (§ 8, subd. 9, ¶ g, as amd. by Laws of 1917, chap. 623.)

The objection that this statute did not expressly forbid the " issue " of certificates, but instead authorized the Commissioner to " suspend the privileges," and prohibit the " sale of alcoholic beverages," is without merit. These terms are in keeping with like parts of the Liquor Tax Law, which provide for suspension, as distinguished from abandonment, of the holder's privileges. The local option provisions (§ 13, as amd. by Laws of 1910, chap. 485), by which the voters may forbid liquor sales, operate to suspend all traffic during two years. If thereafter the electors vote the other way, the privileges again become lawful. (*People ex rel. Sandman* v. *Brush,* 179 N. Y. 93.) Suspension is specially appropriate to such a temporary restriction imposed for an emergency, which may end with peace, or may be wholly removed by a transfer of the traffic out of the restricted area. The power to set bounds to such an area may be conferred on the excise officials, when called on by the application of the local city or town authority. (*Village of Saratoga Springs* v. *Saratoga Gas, etc., Co.,* 191 N. Y. 123.) To deny the authority thus to appoint officials to carry out, apply and administer the legislative will, by defining the territory to be affected, would require the Legislature either to lay down an iron standard for all cases, or else to pass a special act for each camp, barrack or munition factory, which, being once fixed, could not be changed, except by fresh legislation. Examples of such delegated power over administrative details. are familiar in both State and Federal legislation; such as Public Service Commissions, commissions to fix rates, to exercise censorship over moving pictures, and appointive bodies to define harbor lines. " The Legislature must declare the policy of the law and fix the legal principles which are to control in given cases; but an administrative body may be invested with the power to ascertain the facts and conditions to which the policy and principles apply. If this could not be done there would be infinite confusion in the laws, and in an effort to detail and to particularize, they would miss sufficiency both

in provision and execution." (*Mutual Film Corporation* v. *Ohio Industrial Comm.*, 236 U. S. 230, 245.)

This court should not lightly declare such exercise of the State's power to be unconstitutional. Justice WASHINGTON (in *Ogden* v. *Saunders*, 12 Wheat. 213, 269) said that a statute is presumed valid " until its violation of the Constitution is proved beyond all reasonable doubt; " or, as was declared by SAVAGE, Ch. J., " a case must be presented in which there can be no rational doubt." (*Ex parte McCollum*, 1 Cow. 564.) Although modern courts have not always stated this rule so strictly, the case at bar is certainly amenable to its application, since the statute under examination is an instance of an exercise of the police power of the State, which is well said to be " ' the least limitable of the powers of government.' " (*Sligh* v. *Kirkwood*, 237 U. S. 52, 59.)

This legislation now attacked is an emergency measure for the safety and efficiency of the enlisted men while in training and those engaged in munition and equipment services equally important. It is demanded by the " high behests of war," which may call the people to every sacrifice.

Accustomed, as we have become, to the war powers of the Federal government, we are not to overlook the unquestioned war powers still residing in the State. While the State cannot declare war, or in itself carry it on, it is bound to render loyal aid to the general government in the effective prosecution of the war. After raising the military and industrial personnel, it is still under a duty to safeguard them from evil influence, even when its citizens have been mustered into the Federal military service. The State has also in good faith to co-operate in the national policies for war efficiency.

In the corresponding English statute, industrial protection from the sale of intoxicants is put before the demands of the military service. By Orders in Council, an area may be set off which will be subject to regulation, excluding all but the government from such liquor traffic, and imposing other restrictions, if it appear expedient, " on the ground that war material is being made, or loaded, or unloaded, or dealt with in transit, in the area; or that men belonging to His Majesty's naval or military forces are assembled in the area." (Stat. 5 & 6 Geo. V, ch. 42, § 1; L. R. 53 Stat. p. 79.)

To win this war the industrial army in factory, mill and shipyard may become as necessary as the forces in the field. Industrial masses not having been under military training, however, are, therefore, in greater need of protection. The State shares with the general government in the duty to safeguard the men taken from their homes, mustered into the Federal service and assembled in military camps. But the number, which is now greater, gathered in war industries are, for the present, dependent for their protection upon the power of the State alone.

Should a narrow and technical judicial policy weaken and annul this beneficent State statute, the result in this, as in many a past instance, would necessitate an enlargement of Federal control so as to bring the general government more and more into State affairs. The Draft Act,* approved May 18, 1917, in section 12 authorizes the President, as Commander in Chief of the Army, to make "such regulations governing the prohibition of alcoholic liquors in or *near* military camps and to the officers and enlisted men of the Army as he may from time to time deem necessary or advisable." (40 U. S. Stat. at Large, 82, § 12.) Such control is the more wholesome and, being backed by local sentiment, should be more effective, if administered under the principles of home rule. The vast field of the Washington executive already overburdens the President. He should not be called on to supplement, and certainly not to replace, the proper and legitimate exercise of the police power of New York. It is now settled that, by virtue of its general sovereignty, the United States may take such measures as are necessary to insure peace and order in the performance of any of its functions. (*Ex parte Siebold*, 100 U. S. 371; *Matter of Debs*, 158 id. 564.)

The occasion for this enactment is not disputed. Conditions threaten to demoralize camps, and to hinder, obstruct and delay the production of needed war material. Sales of intoxicants in this region have also led to serious assaults on

---

* Entitled: "An act to authorize the President to increase temporarily the military establishment of the United States." (Laws of the 65th Cong. Sess. I, chap. 15.) — [Note by Court.

government workmen passing through this neighborhood. Suspending the liquor traffic will abate most of these conditions, which otherwise may jeopardize the arming and equipment of transports and other government shipping, as well as endangering the efficient output of munitions. The statute should, therefore, be sustained.

We are confined to the questions arising on the records before us; and, therefore, have not considered the effect of this excise order upon the 1916 liquor tax certificates, which had not expired when the order took effect.

I advise that the order of the judge of the County Court of Kings county directing the issue of a tax certificate for the excise year beginning October 1, 1917, be reversed, with fifty dollars costs and disbursements of this appeal, and that the writ of certiorari be dismissed, with fifty dollars costs.

THOMAS, STAPLETON, RICH and BLACKMAR, JJ., concurred.

Order of the judge of the County Court of Kings county directing the issue of a tax certificate for the excise year beginning October 1, 1917, reversed, with fifty dollars costs and disbursements of this appeal, and writ of certiorari dismissed, with fifty dollars costs.