CLEVELAND MACARONI CO. v. STATE BOARD OF HEALTH OF CALIFORNIA et al.

(District Court, N. D. California, Second Division. ·March 3, 1919.)

No. 415.

1. COMMERCE ⊂⇒41(3)—GOODS SHIPPED IN INTERSTATE COMMERCE—PACKAGES.
   Goods packed in cartons, shipped in interstate commerce, and sold by importing wholesalers to retailers, by whom they are removed from the shipping cases, and the cartons placed on sale to consumers, are removed from the domain of interstate commerce.

2. COMMERCE ⊂⇒60(3)—POWER OF STATE TO REGULATE SALE—MISBRANDING.
   Food and Drugs Act June 30, 1906 (Comp. St. 1916, § 8717 et seq.), by prohibiting adulteration or misbranding, does not interfere with the power of a state, after a product has become a part of its retail commerce, to prescribe the standard of purity to entitle it to be sold under a certain brand or label.

3. CONSTITUTIONAL LAW ⊂⇒62—DELEGATION OF POWER—REGULATION OF SALE OF FOOD.
   It is competent for a state, in regulating the sale of food products, to adopt the standard of percentage of ingredients fixed by the Department of Agriculture to entitle an article to be sold under a certain label, without making act an obnoxious delegation of power.

In Equity. Suit by the Cleveland Macaroni Company against the State Board of Health of California and others. On motion by complainant for preliminary injunction. Denied.

Theodore A. Bell, of San Francisco, Cal., for plaintiff.
Kemper B. Campbell, of Los Angeles, Cal., for defendants.

VAN FLEET, District Judge. Application by plaintiff for a preliminary injunction. The bill discloses that plaintiff manufactures in Ohio the well-known article of food popularly called "noodles," and introduces its product into this state through the medium of local wholesalers and jobbers for sale to retailers, and ultimately through the latter to the consumer. The goods are doubly labeled on their packages or containers as "Golden Egg Brand Noodles" and "Golden Age Noodles," and are shipped to the jobbers who, according to the allegations of the bill, "distribute the same to retail dealers for sale to consumers in the same packages" in which they leave the factories, and that the packages "remain unbroken until they reach the hands of the individual consumers."

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

It is alleged that the defendant State Board of Health threatens to proceed under the provisions of the Pure Food Law of the state (Stats. Cal. 1907, c. 181, p. 208), to seize and quarantine plaintiff's goods as misbranded and thus prevent their sale, and it is alleged that such action will violate plaintiff's rights under the commerce clause of the Constitution (article 1, § 8, cl. 3) and the Food and Drugs Act of June 30, 1906 (34 Stat. 768, c. 3915 [Comp. St. § 8717 et seq.]), and cause irreparable injury to plaintiff; hence this application to restrain the threatened acts pending the final hearing.

[1] 1. Plaintiff's main contention is that its goods are a part of interstate commerce and that it is not competent for the state to interfere to regulate the manner of their sale or disposition.

The defendant in its return distinctly disclaims any purpose or intention to interfere with the goods until after they have been sold by the importing wholesaler to the retailer, removed from the cases in which shipped, and placed on the shelves of the latter for sale to the consumer. Ordinarily such disposition withdraws goods shipped into a state from the domain of interstate commerce, and makes them a part of the general body of local commerce, and subjects them to any reasonable regulations by the state. Austin v. Tennessee, 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224; Ex parte Maier, 103 Cal. 484, 37 Pac. 402, 42 Am. St. Rep. 129.

Plaintiff insists, however, that under the principles of McDermott v. Wisconsin, 228 U. S. 115, 33 Sup. Ct. 431, 57 L. Ed. 754, 47 L. R. A. (N. S.) 984, Ann. Cas. 1915A, 39, its goods are still a part of interstate commerce and solely subject to regulation by Congress, notwithstanding they may have been sold by the wholesaler to the retailer, so long as they remain in the original packages in which they were packed by the manufacturer, and the allegations of its bill are evidently shaped to bring the case made within that contention. But in this I think plaintiff has misapprehended the scope and effect of the principles announced in that case. The case was somewhat unusual in its circumstances. The sale of the goods was directly by the manufacturer in one state to the retailer in another, the latter thus being the original recipient from the manufacturer without any intermediate sale within the state. The state law of Wisconsin, into which the goods were shipped, moreover, undertook to forbid a sale within the state of the particular food product without a removal of the label or brand under which it had been received and the substitution of one prescribed by the local law, although the label or brand under which it had been shipped into the state was not violative of the requirements of the federal Food and Drugs Act. The court held that, as the commodity was still in the hands of the original importer, it was to be regarded as a part of interstate commerce and was not subject to state regulation, and, further, that to require the label to be removed while the article remained unsold would be an unwarranted interference with the regulations adopted by Congress for the protection of such commerce.

That is as far as that case goes. It was manifestly not intended by anything there said to work any change in the principles previously

announced, and often reaffirmed by that court, on the question when commodities carried in interstate commerce cease to be a part of such commerce and come under the control of the regulatory power of the state. This is made plain by the court's own interpretation of that decision in the recent case of Weigle v. Curtice Bros. Co., 248 U. S. 285, 39 Sup. Ct. 124, 63 L. Ed. ——, where it is said:

"For reasons stated in McDermott v. Wisconsin, 228 U. S. 115, 33 Sup. Ct. 431, 57 L. Ed. 754, 47 L. R. A. (N. S.) 984, Ann. Cas. 1915A, 39, if the state could require the label to be removed while the bottles remained in the importer's hands unsold, it could interfere with the means reasonably adopted by Congress to make its regulations obeyed. But all this has nothing to do with the question when interstate commerce is over and the articles carried in it have come under the general power of the state. The law upon that point has undergone no change."

The present case is precisely similar in its facts, so far as their legal aspects are concerned, to the Weigle Case. It appears from defendant's return on the order to show cause that the plaintiff's goods are shipped into the state in large containers or boxes, each containing a certain number of small packages or paper cartons, in quantities suitable for sale to the consumer, and that it is in this latter form they are sold by retailers. The McDermott Case has no application to such a state of facts. Nor is there anything in either Schollenberger v. Penn., 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49, or Collins v. New Hampshire, 171 U. S. p. 30, 18 Sup. Ct. 768, 43 L. Ed. 60, to support plaintiff's contention. Both cases, so far as they bear upon the question, are quite in harmony with the views above expressed.

[2] 2. Nor is there anything of substance in plaintiff's further contention that the provisions of the state law sought to be enforced by the defendants contravene or are in conflict with the Food and Drugs Act. Plaintiff's goods, as we have seen, are labeled in a manner to convey the impression that they are within the class of what in the trade are known as "egg noodles"; that is, noodles containing a substantial quantity of egg ingredient in their composition. The claim of the defendant board that they are misbranded or mislabeled is based upon the fact, as disclosed in its affidavits, that the goods do not contain the quantity of egg ingredient to entitle them to be classed as "egg noodles"; that analysis shows that they contain but 2 per cent. of egg, whereas the state law requires that they should contain at least 5 per cent. of egg ingredient—the percentage fixed by the United States Department of Agriculture (which the state law [section 3] adopts as the standard of purity) to entitle them to be classed as "egg noodles"; that consequently they can only be properly labeled and sold under the state law as "plain noodles" or "water noodles."

Plaintiff's contention is, however, in effect that Congress has undertaken to prescribe a standard of purity for such products and as to how they are to be branded, and that it is not competent for the state to prescribe a different standard or measure of purity or manner of labeling; in other words, that, Congress having legislated on the subject, its enactment prescribes the exclusive measure of requirement for the manufacturer which the state is not at liberty to transgress, even after the goods have reached the hands of the retailer.

But this contention confounds the distinction, always to be kept in mind, between the power of Congress to regulate interstate commerce and that of the several states, under their ample police powers, to regulate without interference all that pertains to their own internal affairs, including their domestic commerce, in such manner as will in the judgment of the particular state best conserve the welfare of its inhabitants. This distinction arises out of our dual system of government and the respective powers granted to the federal government on the one hand and reserved to the states on the other, as clearly expressed in the Constitution. The federal Food and Drugs Act, in all its provisions, keeps this distinction well in view, and discloses very clearly that it is not intended to trench upon the powers of the states in any respect. It aims, as its title imports, at "preventing the manufacture, sale or transportation of adulterated or misbranded or poisonous or deleterious foods, drugs," etc., but only while and so long as the commodities remain a part of interstate commerce and so under the control of Congress. It does not undertake to prescribe any precise standard of purity or the manner in which goods shall be branded or labeled, contenting itself with the requirement that they shall not be adulterated, or sophisticated, or otherwise rendered deleterious to health, and, if labeled or branded as to character or quality, that such marking shall be correct and truthful. But these provisions, and any regulations made in pursuance of them, as before stated, cease to affect a commodity when it has finally come within the range of state control. These principles are thus aptly and clearly expressed in the Weigle Case:

"The Food and Drugs Act indicates its intent to respect the recognized line of distinction between domestic and interstate commerce too clearly to need argument or an examination of its language. It naturally would, as the distinction is constitutional. The fact that a food or drug might be condemned by Congress, if it passed from state to state, does not carry an immunity ot foods or drugs, making the same passage, that it does not condemn. Neither the silence of Congress nor the decisions of officers of the United States have any authority beyond the domain established by the Constitution. Rast v. Van Deman & Lewis Co., 240 U. S. 342, 362, 36 Sup. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A, 421, Ann. Cas. 1917B, 455. When objects of commerce get within the sphere of state legislation, the state may exercise its independent judgment, and prohibit what Congress did not see fit to forbid. When they get within that sphere is determined, as we have said, by the old long-established criteria. The Food and Drugs Act does not interfere with state regulation of selling at retail. Armour & Co. v. North Dakota, 240 U. S. 510, 517, 36 Sup. Ct. 440, 60 L. Ed. 771, Ann. Cas. 1916D, 548; McDermott v. Wisconsin, 228 U. S. 115, 131, 33 Sup. Ct. 431, 57 L. Ed. 754, 47 L. R. A. (N. S.) 984, Ann. Cas. 1915A, 39. Such regulation is not an attempt to supplement the action of Congress in interstate commerce, but the exercise of an authority outside of that commerce that always has remained in the states."

3. There is nothing in the state law, so far as the provisions here involved are concerned, which would seem to transcend the power of the state in the reasonable exercise of its regulatory power. The provisions are evidently aimed at the protection of its inhabitants against deceit and misrepresentation as to the real character of the food presented for their consumption; and it matters not in this respect if plaintiff's goods be, as claimed, healthful and nutritious food and free

from deleterious matter. It is a question of requiring them to be labeled and sold for what they really are, and not as something else; one of fair dealing with the public. The Hebe Co. v. Shaw, 248 U. S. 297, 39 Sup. Ct. 125, 63 L. Ed. ——.

[3] 4. It was perfectly competent for the state act to adopt as a standard of purity for the enforcement of its regulations the determinations of the Department of Agriculture, and such enactment involves no obnoxious delegation of legislative power. Ex parte Gerino, 143 Cal. 412, 77 Pac. 166, 66 L. R. A. 249; Arwine v. Board Medical Examiners, 151 Cal. 499, 91 Pac. 319; St. Louis, I. M. & S. Ry. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061.

In view of these considerations, the application for an injunction must be denied.