PEOPLE v. SELL.

1. Municipal Corporations—Home Rule Cities—Constitutional Law.

Under provisions of Constitution authorizing the legislature to enact general laws for the incorporation of cities empowering electors therein to frame, adopt and amend the city charter and the legislative body thereof to pass ordinances relating to its municipal concerns, it was intended to secure a greater

degree of home rule than formerly possessed and to confer almost exclusive rights in the conduct of municipal affairs, subject to the Constitution and general laws of the State (Const. 1908, art. 8, §§ 20, 21; 1 Comp. Laws 1929, § 2239, as amended by Act No. 283, Pub. Acts 1941; § 2240).

2. SAME—HOME RULE CITIES—CONSTRUCTION OF STATUTES.

The home rule city act is a general grant of rights and powers subject to certain enumerated restrictions and leaves many things to be implied from the power conferred and should be construed liberally.

3. STATUTES—PRESUMPTIONS—CONSTITUTIONAL LAW—ORDINANCES.

The same presumption of constitutionality applies to a city ordinance as to a State statute.

4. SAME—PRESUMPTIONS—CONSTITUTIONAL LAW.

A statute will be presumed to be constitutional by the courts unless the contrary clearly appears and in case of doubt every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of legislation.

5. MUNICIPAL CORPORATIONS—HOME RULE CITIES.

Except as limited by the Constitution or by statute, the police power of a home rule city is of the same general scope and nature as that of the State.

6. CONSTITUTIONAL LAW—POLICE POWER.

The "police power" is said to be a power or organization of a system of regulations tending to the health, order, convenience, and comfort of the people and to the prevention and punishment of injuries and offenses to the public, it being an expression of an instinct of self-preservation attributed to all self-governing bodies as indispensable to their healthy existence and to the public welfare and embracing all rules and regulations for the protection of life and the security of property.

7. SAME—PURPOSE OF POLICE POWER.

The "police power" has for its object the improvement of social and economic conditions affecting the community at large and collectively with a view to bringing about the greatest good of the greatest number and no fixed limitations have been set upon subjects calling for the exercise of this power.

8. SAME—PUBLIC WELFARE.

Safeguarding the general or public welfare in its most comprehensive sense justifies the imposition of restriction or prohibi-

tion on individual action and use of property in the interest of the community.

9. SAME—PUBLIC INTEREST—MUNICIPAL CORPORATIONS.

The State may interfere directly or indirectly with individual action and use of property by any of its agencies including its municipal corporations whenever the public interests demand it and a large discretion is necessarily vested in the legislature to determine what the interests of the public require as well as the measures necessary for the protection of such interests. .

10. MUNICIPAL CORPORATIONS—ORDINANCES—POLICE POWER.

Ordinances having for their purpose regulated municipal development, the security of home life, the preservation of a favorable environment in which to rear children, the protection of morals and health, the safeguarding of the economic structure upon which the public good depends, the stabilization of the use and value of property, the attraction of a desirable citizenship and fostering its permanency are within the proper ambit of the police power.

11. CONSTITUTIONAL LAW—COMMODITY PRICE CONTROL.

Control of commodity prices, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.

12. SAME—POLICE POWER—WAR.

In time of war a State may make the national purposes its own purposes to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes; hence statutes and ordinances may then be enacted which might be held improper in normal or peace times.

13. MUNICIPAL CORPORATIONS—ORDINANCE AUGMENTING FEDERAL LAWS AND REGULATIONS—WAR.

Ordinance of home rule city, enacted after commencement of war and merely adding the city's enforcement sanction to Federal laws and regulations already applicable to the city and its inhabitants during the war emergency, is not to be judged by the same tests as those applied to an ordinance enacted in peace time.

14. CONSTITUTIONAL LAW—POLICE POWER—EMERGENCY.

Under the police power vested in the legislature to promote the public welfare, it may enact what are known as ''emergency statutes,'' designed to promote the health, morality, comfort, and peace of the people of the State.

15. SAME—REGULATION OF PROFITEERING.

The government has the right to regulate profiteering.

16. SAME—POLICE POWER—PUBLIC FINANCIAL SAFETY.

The police power relates not merely to the public health and to public physical safety, but also to public financial safety.

17. MUNICIPAL CORPORATIONS—ORDINANCES—COMMODITY PRICE CONTROL—POLICE POWER.

Ordinance of home rule city enacted after commencement of war and augmenting Federal emergency price control statutes and regulations so far as commodities were concerned *held*, not within constitutional or statutory prohibitions and well within scope of city's police power (56 Stat. at L. 23; Mich. Const. 1908, art. 8, §§ 20, 21; 1 Comp. Laws 1929, § 2239, as amended by Act No. 283, Pub. Acts 1941; § 2240; Detroit Ordinance No. 349-D).

18. CONSTITUTIONAL LAW—DELEGATION OF LEGISLATIVE POWERS—MUNICIPAL CORPORATIONS.

Prohibitions against the delegation of municipal legislative authority are substantially the same as those against the delegation of State legislative authority.

19. SAME—INTRASTATE TRANSACTIONS—DELEGATION OF REGULATORY POWER—CONFORMING LEGISLATION.

While there may not be a delegation to the Federal government and its agencies of the power of a State to regulate intrastate transactions, it is permissible for a State and its municipal corporations to enact statutes and ordinances in such a way as to conform State and municipal regulation to Federal regulation.

20. SAME—UNITED STATES—MUNICIPAL CORPORATIONS—DELEGATION OF LEGISLATIVE POWER—WAR—PRICE CONTROL—AUGMENTIVE ENFORCEMENT ORDINANCE.

Since congress in the exercise of its war power delegated authority to the office of price administration to regulate prices and fix commodity price ceilings by law throughout the nation, a municipal ordinance augmenting such act by adding a home rule city's enforcement sanction to Federal laws and regulations already in force and effect within the city did not constitute a delegation of legislative authority to the office of price administration but merely effected a mergence of action and reciprocity of service during the present war emergency (U. S. Const. art. 1, § 8; 56 Stat. at L. 23; 1 Comp. Laws 1929, § 2239, as amended by Act No. 283, Pub. Acts 1941; § 2240; Detroit Ordinance No. 349-D).

21. WAR—STATES—MUNICIPAL CORPORATIONS—COOPERATION WITH UNITED STATES.

Although States and municipalities cannot declare war, it becomes their duty to cooperate and render loyal aid to the Federal government during a war emergency.

22. MUNICIPAL CORPORATIONS—COMMODITY PRICE AND RATION REGULATION ORDINANCE.

Intent, purpose and meaning of home rule city ordinance enacted after commencement of war and after enactment of Federal emergency price control act making it unlawful to sell or transfer commodities without complying with ration and price regulations and orders of the Federal government *held,* definite and plain (Detroit Ordinance No. 349–D).

23. WAR—UNITED STATES—MUNICIPAL CORPORATIONS—COMMODITY PRICE AND RATION REGULATION ORDINANCE.

Home rule city ordinance making it illegal to sell or transfer commodities without complying with ration and price regulations of the Federal government *held,* not to operate as an unconstitutional encroachment upon the war powers of congress in view of the express congressional authorization to the price administrator to utilize the services of Federal, State and local agencies (56 Stat. at L. 23, § 201 [a]; Detroit Ordinance No. 349–D).

WIEST, SHARPE, and BOYLES, JJ., dissenting.

Appeal from Wayne; Merriam (DeWitt H.), J. Submitted October 27, 1944. (Docket No. 83, Calendar No. 42,737.) Decided January 2, 1945.

John H. Sell was convicted of violation of an ordinance of the City of Detroit relating to sale of commodities at a price in excess of ceiling price set by the Office of Price Administration. Affirmed.

*Harry S. Bennett,* for appellant.

*Paul E. Krause,* Corporation Counsel, and *Nathaniel H. Goldstick,* Assistant Corporation Counsel, for the people.

*Thomas I. Emerson, Fleming James, Jr., Walter Heddesheimer, David London,* and *Samuel Mermin,* for Office of Price Administration, *amicus curiae.*

Starr, C. J.    This case requires a determination of the constitutionality of ordinance No. 349–D of the city of Detroit, made effective October 14, 1943, reading as follows:

"Sec. 1.    It shall be unlawful for any person, firm, copartnership, association or corporation, in the course of trade or business, to wilfully and knowingly sell or in any way to transfer a commodity rationed by any order or regulation of the United States of America, or any agency thereof, without taking in exchange for such commodity the coupons, stamps, certificates, ration checks or other ration documents, if any, required by the order or regulation in effect at the time of the sale or transfer.

"Sec. 2.    It shall be unlawful for any person to wilfully and knowingly sell a commodity which is the subject of a ceiling price fixed by or under the authority of the United States of America at a price in excess of such ceiling price so established.

"Sec. 3.    Any person, firm, copartnership, association or corporation violating any of the provisions of this ordinance shall, upon conviction thereof be subject to a fine not exceeding $500 or imprisonment in the Detroit house of correction for a period not exceeding 90 days, or both such fine and imprisonment in the discretion of the court.

"Sec. 4.    This ordinance is hereby declared to be necessary for the preservation of the public peace, health and safety and is hereby given immediate effect."

Defendant was arrested and arraigned upon a complaint charging that on October 16, 1943, he violated said ordinance by "wilfully and know-

ingly" offering for sale and selling a dressed
chicken at a price of 50 cents a pound, which was
6 cents a pound in excess of the ceiling price of
44 cents a pound, as "fixed by and under the au-
thority of the United States of America  *  *  *
by order #8 issued August 31, 1943, by the dis-
trict director of the Detroit district of the office of
price administration of the United States govern-
ment." Upon trial without a jury in recorder's
court for the city of Detroit, traffic and ordinance
division, defendant was convicted and was sentenced
to 20 days' imprisonment. His motion for a new
trial was denied, and on review by certiorari the
circuit court entered an order affirming his convic-
tion. Having obtained leave, he appeals from such
order.

In considering the question before us, certain
constitutional, statutory and charter provisions
should be noted. Constitution 1908, art. 8, §§ 20, 21,
state that the legislature "shall provide by a gen-
eral law for the incorporation of cities," and that
the electors of each city shall have power "to frame,
adopt and amend its charter  *  *  *  and, through
its regularly constituted authority, to pass all laws
and ordinances relating to its municipal concerns,
subject to the Constitution and general laws of this
State." Referring to the above provisions of the
Constitution, we said in *Village of Kingsford* v.
*Cudlip,* 258 Mich. 144, 148:

"The purpose of these and other provisions
which follow undoubtedly was to secure to cities
and villages a greater degree of home rule than
they formerly possessed. The provision for a gen-
eral law for their incorporation was intended to
confer upon them almost exclusive rights in the
conduct of their affairs, not in conflict with the
Constitution or general laws applicable thereto."

The home rule city act (Act No. 279, §§ 4-i, 4-j, Pub. Acts 1909, as added by Act No. 126, Pub. Acts 1929, and as amended by Act No. 283, Pub. Acts 1941 [Comp. Laws Supp. 1943, § 2239, 1 Comp. Laws 1929, § 2240, Stat. Ann. 1944 Cum. Supp. § 5.2082, Stat. Ann. § 5.2083]) provides in part:

"SEC. 4-i.   Each city may in its charter provide:
*   *   *

"(4)   For the regulation of trades, occupations and amusements within its boundaries, not inconsistent with State and Federal laws, and for the prohibition of such trades, occupations and amusements as are detrimental to the health, morals or welfare of its inhabitants."

"SEC. 4-j.   Each city may in its charter provide:
*   *   *

"(3)   For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns subject to the Constitution and general laws of this State."

In considering the home rule act, in *City Commission of Jackson* v. *Hirschman,* 253 Mich. 596, we said:

"A reading of the home-rule act shows that it is rather comprehensive in its provisions as to what the city may or may not incorporate in its charter, but it leaves many things to be implied from the power conferred.   *   *   *   The purpose of the legislative enactment was to give the city a large measure of home rule.   *   *   *   Considering its

purpose, it should be construed liberally and in a home-rule spirit.''

In the case of *City of Pontiac* v. *Ducharme*, 278 Mich. 474, 480, we quoted with approval from *Gallup* v. *City of Saginaw*, 170 Mich. 195, as follows:

"The new system (referring to the home rule act) is one of general grant of rights and powers, subject only to certain enumerated restrictions, instead of the former method of only granting enumerated rights and powers definitely specified. We must assume the act was passed with that intent and construe it accordingly."

Title 3, chap. 1, § 12, of the charter of the home rule city of Detroit, as amended in 1938, provides that the city shall have power:

"(d) To enact ordinances to carry into effect the powers conferred and the duties imposed upon the city by the Constitution and laws of the State, to make operative the provisions of this charter, and to promote the general peace, health, safety, welfare and good government of the city; and to provide for the enforcement of such ordinances and the punishment of violations thereof. * * *

"(n) To provide for the regulation of trades, occupations and amusements."

The ordinance under consideration, which was declared to be "necessary for the preservation of the public peace, health and safety," was adopted for the purpose of augmenting the enforcement of regulations and orders promulgated by the office of price administration under the Federal emergency price control act of 1942 (56 Stat. at L. 23 [50 USCA, Appendix, § 901 *et seq.*]). Said act, which was enacted by the congress as an emergency measure during the war period, declared its purpose to be as follows:

"It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices; * * * and to permit voluntary cooperation between the government and producers, processors, and others to accomplish the aforesaid purposes."

Defendant contends that the ordinance is unconstitutional because not a proper exercise of the police power of the city. It should be noted that the same presumption of constitutionality applies to a city ordinance as to a State statute. *Goldstein* v. *City of Hamtramck*, 227 Mich. 263. In the case of *Cady* v. *City of Detroit*, 289 Mich. 499, 505, we said:

"A statute will be presumed to be constitutional by the courts unless the contrary clearly appears; and in case of doubt every possible presumption not clearly inconsistent with the language and the

subject matter is to be made in favor of the constitutionality of legislation. *Scott* v. *Smart's Executors,* 1 Mich. 295; *Sears* v. *Cottrell,* 5 Mich. 251; *Thompson* v. *Auditor General,* 261 Mich. 624. Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity. A statute is presumed to be constitutional and it will not be declared unconstitutional unless clearly so, or so beyond a reasonable doubt. *Attorney General, ex rel. Barbour,* v. *Lindsay,* 178 Mich. 524; *Bowerman* v. *Sheehan,* 242 Mich. 95 (61 A. L. R. 859)."

Except as limited by the Constitution or by statute, the police power of Detroit as a home rule city is of the same general scope and nature as that of the State. Therefore, authorities relating to the police power of the State are equally applicable in relation to the police power of the city. In *People* v. *Brazee,* 183 Mich. 259 (L. R. A. 1916 E, 1146), we defined police power as follows (p. 262):

"The 'police power' is said to be a power or organization of a system of regulations tending to the health, order, convenience, and comfort of the people and to the prevention and punishment of injuries and offenses to the public. It is the expression of an instinct of self-preservation and characteristic of every living creature, an inherent faculty and function of life, attributed to all self-governing bodies as indispensable to their healthy existence and to the public welfare. It embraces all rules and regulations for the protection of life and the security of property. 28 Cyc. p. 692; 31 Cyc. p. 902. It has for its object the improvement of social and economic conditions affecting the community at large and collectively with a view to

bring about 'the greatest good of the greatest number.' Courts have consistently and wisely declined to set any fixed limitations upon subjects calling for the exercise of this power. It is elastic and is exercised from time to time as varying social conditions demand correction."

In 3 McQuillin on Municipal Corporations (2d Ed., 1943 Rev.), § 942, it is stated in part (pp. 86, 88):

"Safeguarding the general or public welfare in its most comprehensive sense, then, it may be said, is at present judicially sanctioned as a basis justifying impositions of restriction or prohibition on individual action and the use of property, in the interest of the community.    *    *    *    It is now no longer questioned that the State may interfere directly or indirectly by any of its agencies, *including, of course, the municipal corporation,* 'whenever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests.' Accordingly, the police power is sufficiently comprehensive to embrace new subjects as exigencies arise and changing conditions require.    *    *    *
"The public welfare in its broadest sense has been adopted as the basis of construction."

In discussing the police power of the city of Detroit to enact an ordinance regulating trailer camps, we said in *Cady* v. *City of Detroit, supra* (p. 514):

"Ordinances having for their purpose regulated municipal development, the security of home life, the preservation of a favorable environment in which to rear children, the protection of morals and health, *the safeguarding of the economic structure upon which the public good depends,* the stabiliza-

tion of the use and value of property, the attraction of a desirable citizenship and fostering its permanency are within the proper ambit of the police power.''

In the case of *Nebbia* v. *New York,* 291 U. S. 502, 537, 539 (54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469), the supreme court of the United States said:

''There can be no doubt that upon proper occasion and by appropriate measures the State may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.    *    *    *

''Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.''

See, also, *Milk Marketing Board* v. *Johnson,* 295 Mich. 644.

The ordinance in question was adopted as an emergency measure to aid the Federal government in its effort to stabilize prices, prohibit profiteering, and prevent inflation during the war period.    Its purpose was to aid the war effort, to protect the national welfare and the welfare of the city's inhabitants.    It represents a home-front attack upon the common enemies of profiteering and inflation. In discussing price control in time of war, the court said in *Brown* v. *Hecht Co.,* 78 App. D. C. 98, 103, 104 (137 Fed. [2d] 689):

''When congress passed the emergency price control act it realized that there was an emergency.    It knew that the war was producing and would produce prodigious increases in public expenditures and private purchasing power together with a dearth of many things for which buyers compete. It knew that unless effective price control was

achieved, these conditions would force up prices and then wages to meet prices and then prices to meet wages, until, and even after, inflation became fantastic. It realized that, as the senate committee said, 'of all the consequences of war, except human slaughter, inflation is the most destructive. * * * Rising prices and increases in the cost of living bring misery to our people, cause industrial unrest, and undermine our unity. * * * Living costs tend to rise more quickly than wages, [and] the burdens of war are haphazardly distributed, with the heaviest burden on the farmer, the salaried worker, the small investor, the pensioner, and the veteran, whose incomes cannot readily be expanded. Rising living costs mean labor disputes and spiraling wage demands. And the suspicion of profiteering causes discontent which hampers production as surely as the bombing of factories. Rising prices now foreshadow * * * deflation later with attendant depression and suffering. Such prospects and fears * * * sap energy and morale now. Rising prices limit production. * * * Rising prices inevitably increase the cost of the defense program.'

"Inflation is infectious and cumulative. It cannot be prevented in general unless it is prevented in particular."

In *State* v. *Holm,* 139 Minn. 267, 275 (166 N. W. 181, L. R. A. 1918 C, 304), the court stated that in time of war a State may "make the national purposes its own purposes to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes." In *Gilbert* v. *State of Minnesota,* 254 U. S. 325, 329 (41 Sup. Ct. 125, 65 L. Ed. 287), the court said,

"This country is one composed of many and must on occasions be animated as one and * * * the

constituted and constituting sovereignties must have power of cooperation against the enemies of all.''

See 10 George Washington Law Review, pp. 935–937, 942, 943.

It should be noted that the ordinance did not create new regulations and prohibitions but merely added the city's enforcement sanction to Federal laws and regulations which were already applicable to the city and its inhabitants during the emergency. We have repeatedly recognized that emergencies may require the enactment of statutes or ordinances which might be held improper in normal times. Therefore, this ordinance should not be judged by the same tests as those applied to an ordinance enacted in peace time. In *Bankers Trust Co. of Detroit* v. *Russell,* 263 Mich. 677, 683, we said:

''Under the police power vested in the legislature to promote the public welfare, it may enact what are known as 'emergency statutes,' designed to promote the health, morality, comfort, and peace of the people of the State. *Edgar A. Levy Leasing Co.* v. *Siegel,* 258 U. S. 242 (42 Sup. Ct. 289, 66 L. Ed. 595).''

See *In re Brewster Street Housing Site,* 291 Mich. 313; *Russell* v. *Battle Creek Lumber Co.,* 265 Mich. 649. See, also, *Home Building & Loan Association* v. *Blaisdell,* 290 U. S. 398 (54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481); *Marcus Brown Holding Company, Inc.,* v. *Feldman,* 256 U. S. 170 (41 Sup. Ct. 465, 65 L. Ed. 877); *People, ex rel. Durham Realty Corporation,* v. *La Fetra,* 230 N. Y. 429 (130 N. E. 601, 16 A. L. R. 152).

Ordinances and statutes of similar import to the ordinance involved in the present case, which were

enacted to augment the enforcement of Federal price control during the war emergency, have been held constitutional as a valid exercise of municipal police power. See *Mosner* v. *Haddock,* 181 Misc. 486 (46 N. Y. Supp. [2d] 343, affirmed without opinion in 268 App. Div. 752 [48 N. Y. Supp. (2d) 802]); *Butter & Egg Merchants Ass'n, Inc.,* v. *LaGuardia,* 181 Misc. 889 (47 N. Y. Supp. [2d] 913); *People, ex rel. Weber,* v. *D'Esposito,* 181 Misc. 773 (45 N. Y. Supp. [2d] 865); *People, on complaint of Cooper,* v. *Roth,* 181 Misc. 612 (44 N. Y. Supp. [2d] 193); *People, on complaints of Bailey,* v. *Mailman,* 182 Misc. 870 (49 N. Y. Supp. [2d] 733).

In *Leonard, Jr.,* v. *State,* 100 Ohio St. 456 (127 N. E. 464), the court considered the constitutionality of a statute regulating the cold storage of foods, which was apparently designed to prevent the hoarding of foods to force higher prices. The court there said (p. 459):

"The dimensions of the government's police power are identical with the dimensions of the government's duty to protect and promote the public welfare. The measure of police power must square with the measure of public necessity. The public need is the polestar for the enactment, interpretation and application of the law. If there appears in the phrasing of the law and the practical operation of the law a reasonable relation to the public need, its comfort, health, safety and protection, then such act is constitutional unless some express provision of the Constitution be clearly violated in the operation of the act. * * *

"The war has developed new conditions which we cannot ignore if we would, and which we should not ignore if we could. Not the least of these new conditions that now confront us is the unconscionable profiteering. The right of the government to regulate profiteering is centuries old."

In considering the constitutionality of a city ordinance, in *Holsman* v. *Thomas,* 112 Ohio St. 397, 404 (147 N. E. 750, 39 A. L. R. 760), the court said:

"The police power relates not merely to the public health and to public physical safety, but also to public financial safety. *Laws may be passed within the police power to protect the public from financial loss.*"

We find no constitutional or statutory prohibitions against the enactment of the ordinance in question, and under the facts and circumstances existing at the time of its enactment, we are convinced that it was well within the scope of the city's police power.

Defendant further contends that the ordinance is unconstitutional as an invalid delegation of legislative authority. This contention is based on the premise that the common council of Detroit attempted to adopt, by reference, certain functions of the emergency price control act and regulations of the office of price administration. It should be borne in mind that prohibitions against the delegation of municipal legislative authority are substantially the same as those against the delegation of State legislative authority. The validity of a statute authorizing the adoption and promulgation by the State war council of Federal price administration regulations was considered in *Mosner* v. *Haddock, supra.* The court there said:

"This is a motion made to obtain an order prohibiting the respondent, a city magistrate of the city of New York, * * * from hearing and disposing of charges. filed against the petitioner for selling pork products at prices in excess of the ceiling prices fixed and determined by the United States office of price administration. * * *

"There seems to be no force to the argument that the ruling in *Darweger* v. *Staats,* 267 N. Y. 290 (196

N. E. 61) (cited by defendant in the present case), makes the war emergency act * * * unconstitutional. What was held there is that there could be no delegation to the Federal government and its agencies of the power of the State to regulate intrastate transactions. Here we have a war statute which seeks to enforce laws and regulations that the citizen must obey and comply with. All that is done is to conform State regulation to Federal regulation. This does not invalidate the statute. *Transit Commission* v. *Long Island R. Co.,* 272 N. Y. 27 (3 N. E. [2d] 622). It follows that the act is constitutional and the magistrate * * * is properly hearing these infractions and has jurisdiction to do so. Any other conclusion would be to give no force or life to statutes, regulations and statutory orders which are necessary for the logical and legitimate exercise of courts of this State in the proper administration of justice in the case of those who violate O. P. A. regulations during the existence of the war.''

See *People, on Complaints of Bailey,* v. *Mailman, supra; Butter & Egg Merchants Ass'n, Inc.,* v. *La-Guardia, supra; Commonwealth* v. *Alderman,* 275 Pa. 483 (119 Atl. 551).

It seems clear that the ordinance before us does not delegate legislative authority to the office of price administration, as that office already had authority to regulate prices and fix price ceilings in the city of Detroit, under the emergency price control act which was passed by congress in the exercise of its war power under article 1, § 8, of the United States Constitution. Such price control act is the law of the land and applicable throughout the nation. The ordinance merely added the city's enforcement sanction to Federal laws and regulations already in force and effect within the city. It was ''merely augmentive'' of the emergency price control act. *Holgate Bros. Co.* v. *Bashore,*

331 Pa. 255 (200 Atl. 672, 117 A. L. R. 639). See, also, *Commonwealth* v. *Alderman, supra.* In upholding the price control act of Puerto Rico (Laws of Puerto Rico, 1943, Act No. 31, §§ 1–3), its supreme court said in *Irizarry* v. *District Court of Ponce,* — Puerto Rico — (decided July 28, 1944):

"The legislature, in adopting by reference the Federal act, has laid down broad standards, which the supreme court of the United States has upheld. * * * In also providing in effect that the Federal regulations to be promulgated by the administrator under the Federal statute, shall also be insular regulations, the legislature has simply selected the Federal administrator as the administrative official who shall have the power 'to fill up the details' within the broad but valid standards laid down in the law itself."

See *Milk Marketing Board* v. *Johnson, supra; Argo Oil Corporation* v. *Atwood,* 274 Mich. 47; *In re Lasswell,* 1 Cal. App. (2d) 183 (36 Pac. [2d] 678).

Furthermore, the courts have upheld many State laws which adopted Federal standards and regulations or which were designed to augment the enforcement of Federal laws or regulations. *Transit Commission* v. *Long Island R. Co.,* 272 N. Y. 27 (3 N. E. [2d] 622); *Smith* v. *Alphin,* 150 N. C. 425 (64 S. E. 210); *Cleveland Macaroni Co.* v. *State Board of Health of California,* 256 Fed. 376; *Watkinson* v. *Hotel Pennsylvania,* 195 App. Div. 624 (187 N. Y. Supp. 278, affirmed 231 N. Y. 562 [132 N. E. 889]); *Underwood Typewriter Co.* v. *Chamberlain,* 94 Conn. 47 (108 Atl. 154); *Brown* v. *State,* 323 Mo. 138 (19 S. W. [2d] 12); *Carter* v. *Virginia,* 321 U. S. 131 (64 Sup. Ct. 464, 88 L. Ed. 605); *James* v. *Walker,* 141 Ky. 88 (132 S. W. 149). In discussing

this subject, 33 Michigan Law Review, p. 597, states in part (pp. 601, 602):

"A number of States have passed laws adopting either in whole or in part the provisions of the migratory bird treaty act and the regulations thereunder. Several States in the enactment of narcotic laws have adopted some of the standards prescribed by administrative officers under the Federal narcotic laws. Federal standards prescribed under the pure food and drug act have been adopted by a number of States. The license and bond requirements governing warehousemen qualifying under the Federal warehouse act have been adopted by a considerable group of States. Likewise there has been a widespread adoption by States of Federal grain standards under the grain standards act and of Federal vegetable and fruit-grading standards. Some States in the oil-producing regions have provisions in their conservation statutes adopting and making automatically effective the rules and regulations of the department of the interior. * * * A majority of States require pilots to be licensed and aircraft to be registered in accordance with the Federal regulations."

It is interesting to note that many statutes of this State adopt or are made dependent upon Federal laws, regulations and standards.

"In all prosecutions arising under the food and drug laws of this State for the manufacture or sale of an adulterated, misbranded or otherwise unlawful article of food, drink, condiment or drug, the latest standards of purity for food products, established by the United States secretary of agriculture, shall be accepted as the legal standards, except in cases where other standards are specifically prescribed by the laws of this State." 1 Comp. Laws 1929, § 5443 (Stat. Ann. § 12.901).

"The standard grades for apples shall be limited to U. S. grades and shall conform in all respects and be identical with the latest standards established by the United States secretary of agriculture for the grades herein mentioned, and thus conforming shall be accepted as the legal standards for the State of Michigan." Act No. 132, § 1, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 5600–1, Stat. Ann. 1944 Cum. Supp. § 12.1209).

"The standard grades for Michigan table stock potatoes shall be limited to U. S. fancy grade, U. S. number one a and b grades, U. S. commercial grade, and U. S. number two a and b grades, and shall conform in all respects and be identical with the latest standards established by the United States secretary of agriculture for the grades herein mentioned, and thus conforming shall be accepted as the legal standards for the State of Michigan." 1 Comp. Laws 1929, § 5603, as amended by Act No. 342, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 5603, Stat. Ann. 1944 Cum. Supp. § 12.1231).

See Act No. 63, Pub. Acts 1931, as amended by Act No. 265, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 4828–1 *et seq.,* Stat. Ann. and Stat. Ann. 1944 Cum. Supp. § 10.41 *et seq.*), requiring that aircraft be registered and that pilots be certified in accordance with the provisions of the United States civil aeronautics authority act. See, also, Detroit municipal code, 1936, chap. 100, § 4 (a), which provides that the standards, rules and regulations for the inspection of live animals and carcasses "shall be those now in use by the bureau of animal industry of the United States government."

From the above discussion it is clear that Michigan and many other States have recognized the necessity and propriety of a mergence of action and reciprocity of service for the common good between

the two sovereign powers, the State and the Federal government. By the adoption of the ordinance in question, the home rule city of Detroit was merely effectuating such mergence of action and reciprocity of service during the present war emergency. See 1 Sutherland, Statutory Construction (3d Ed.), p. 68, § 310; 23 Iowa Law Review, p. 455; 46 Yale Law Journal, pp. 599–623. See, also, *Butter & Egg Merchants Ass'n, Inc.,* v. *LaGuardia, supra; Mosner* v. *Haddock, supra; People, on complaints of Bailey,* v. *Mailman, supra.*

Although States or municipalities cannot declare war, it becomes their duty to cooperate and render loyal aid to the Federal government during a war emergency. In holding constitutional a State statute authorizing the excise commissioner to suspend privileges under liquor tax certificates and to prohibit the sale of liquor in proximity to camps, barracks, and factories manufacturing war munitions, the court said in *People, ex rel. Doscher,* v. *Sisson,* 180 App. Div. 464, 468, 469 (167 N. Y. Supp. 801, affirmed 222 N. Y. 387 [118 N. E. 789]):

"This legislation * * * is an emergency measure for the safety and efficiency of the enlisted men while in training and those engaged in munition and equipment services equally important. It is demanded by the 'high behests of war,' which may call the people to every sacrifice.

"Accustomed, as we have become, to the war powers of the Federal government, we are not to overlook the unquestioned war powers still residing in the State. While the State cannot declare war, or in itself carry it on, it is bound to render loyal aid to the general government in the effective prosecution of the war. After raising the military and industrial personnel, it (the State) is still under

a duty to safeguard them from evil influence. * * * The State has also in good faith to co-operate in the national policies for war efficiency. * * *

"The number * * * gathered in war industries are, for the present, dependent for their protection upon the power of the State alone."

See *Cook* v. *Burnquist,* 242 Fed. 321; *State* v. *Holm, supra; Mosner* v. *Haddock, supra; Brown* v. *Hecht Co., supra.*

In *Public Service Commission* v. *Railroad Co.,* 230 N. Y. 149, 152 (129 N. E. 455, 14 A. L. R. 449), the court said that in time of war "the liberty of the citizen—the protection of private property—the peace-time rights of the States must all yield to necessity." See 27 R. C. L. pp. 915–917; 67 C. J. pp. 365, 366.

The cases of *Darweger* v. *Staats,* 267 N. Y. 290 (196 N. E. 61), and *Hutchins* v. *Mayo,* 143 Fla. 707 (197 South. 495, 133 A. L. R. 394), cited by defendant, involved improper delegation to the Federal government of authority over intrastate matters which were intrusted to the State by the Constitution. Furthermore, such cases did not involve, as does the present case, the attempt of a municipality to cooperate in effectuating regulations already made applicable to the inhabitants of the city by the emergency price control act. The cases of *Colony Town Club* v. *Michigan Unemployment Compensation Commission,* 301 Mich. 107, and *Minor Walton Bean Co.* v. *Unemployment Compensation Commission,* 308 Mich. 636, cited by defendant, did not involve, as does the present case, Federal war emergency legislation and regulations and, therefore, are not determinative of the question before us.

We are satisfied that under the facts and circumstances existing at the time the ordinance in ques-

tion was adopted, it did not constitute an invalid delegation of legislative authority.

We find no merit in defendant's argument that the ordinance is vague, indefinite and uncertain. Its intent, purpose and meaning are definite and plain. The factual situation involved in the case of *People v. Hall,* 290 Mich. 15, cited by defendant clearly distinguishes it from the present case.

The ordinance does not operate as an unconstitutional encroachment upon the war powers of the congress. *Gilbert v. State of Minnesota, supra; State v. Holm, supra.* That congress foresaw the need for State and municipal cooperation is evidenced by section 201 (a) of the emergency price control act (50 USCA, Appendix, § 921 [a]), which provides, "the administrator may utilize the services of Federal, State, and local agencies."

We conclude that the ordinance in question is constitutional. Defendant's conviction is affirmed.

NORTH, BUTZEL, BUSHNELL, and REID, JJ., concurred with STARR, C. J.

BOYLES, J. (*dissenting*). I do not concur. In substance, this ordinance makes it an offense punishable by fine or imprisonment to wilfully and knowingly violate any order or regulation of any agency of the United States government which "rations" a commodity, or sell any commodity at a price in excess of the maximum price fixed "by or under the authority of the United States of America." This ordinance is far more indefinite and uncertain than would be an ordinance which in general terms merely declared it to be an offense to violate any Federal or State statute; because a statute has some permanence, while these orders and regulations of the Federal agency may be, and as a matter of com-

mon knowledge have been, changed from day to day without previous notice.

This ordinance is so indefinite and uncertain that it results in a failure to create or define with sufficient accuracy any criminal offense. *People* v. *Austin,* 301 Mich. 456. A penal law cannot be sustained unless its mandates are so clearly expressed that any ordinary person can determine *in advance* what he may or may not do under it. *People* v. *Sarnoff,* 302 Mich. 266 (140 A. L. R. 1206).

The ordinance is void and the conviction and sentence should be set aside.

WIEST and SHARPE, JJ., concurred with BOYLES, J.