MILLER *v.* DEPARTMENT OF TREASURY,
REVENUE DIVISION

Opinion of the Court

1. Mental Health—Charge for Care—Hospitals—Statutes.

Pursuant to statute, the state determines the charge for the
care and treatment of mental patients in state hospitals by
an average daily rate which may not exceed the anticipated
operating cost, exclusive of capital outlay and the amount
is fixed at the beginning of each fiscal year (MCLA § 330.41).

2. Mental Health—Charge for Care—Hospitals—Liability of
Relatives.

It is clear the legislature intended that the "net taxable income"
to be used in originally determining the monthly liability of
relatives is the same amount prescribed in the statute for de-
termining liability for future fiscal years for the care and

References for Points in Headnotes

[1] 40 Am Jur 2d, Hospitals and Asylums § 6.
  41 Am Jur 2d, Incompetent Persons § 55.
[2, 3, 8, 16, 19, 21, 27] 41 Am Jur 2d, Incompetent Persons § 59.
[3] 16 Am Jur 2d, Constitutional Law § 560 *et seq.*
[4] 50 Am Jur, Statutes §§ 36–39, 215.
[5] 16 Am Jur 2d, Constitutional Law §§ 211, 240.
[6, 7, 9, 10, 13, 15, 16] 16 Am Jur 2d, Constitutional Law § 240 *et
  seq.*
[8, 11] 16 Am Jur 2d, Constitutional Law §§ 240, 242.
[12] 16 Am Jur 2d, Constitutional Law §§ 242, 245.
[14] 16 Am Jur 2d, Constitutional Law § 245.
[17] 16 Am Jur 2d, Constitutional Law § 485 *et seq.*
[18] 50 Am Jur, Statutes §§ 377, 378.
[20, 21] 16 Am Jur 2d, Constitutional Law § 502.
[22, 23] 16 Am Jur 2d, Constitutional Law § 485 *et seq.*
  41 Am Jur 2d, Incompetent Persons § 59.
[24] 16 Am Jur 2d, Constitutional Law §§ 560–568.
[25] 16 Am Jur 2d, Constitutional Law §§ 569–577.
[26] 4 Am Jur 2d, Appeal and Error § 2
  16 Am Jur 2d, Constitutional Law § 584.
[27] 16 Am Jur 2d, Constitutional Law §§ 583, 584.

maintenance of mentally retarded and epileptic persons and mentally ill children admitted to public institutions (MCLA §§ 330.658, 330.659).

3. STATUTES—MENTAL HEALTH—PUBLIC INSTITUTIONS—PAYMENT FOR CARE—LIABILITY OF RELATIVES—NOTICE—HEARING—STANDARDS.

The statute relating to the liability of relatives for the care and maintenance of mentally retarded and epileptic persons and mentally ill children admitted to public institutions and authorizing a responsible relative to request at any time a new determination of liability by the Department of Revenue is glaringly deficient in that: (1) no provision is made for notice of hearing, (2) there is no statutory designation of a hearing officer or examiner to make a determination either from evidence or the submitted information, (3) it contains no legal requirements or provisions to be applied to the facts by the Department of Revenue in redetermining liability, (4) it operates with an uncontrolled discretion, and (5) there are no legislative standards or guidelines for the exercise of the rule-making power (MCLA § 330.660).

DISSENTING OPINION

T. E. BRENNAN, T. G. KAVANAGH, and WILLIAMS, JJ.

4. STATUTES—INCORPORATION BY REFERENCE—FEDERAL LAW—CONSTITUTIONAL LAW.

*Incorporation by reference of an existing Federal law in a state statute does not render that statute constitutionally infirm.*

5. CONSTITUTIONAL LAW—LEGISLATIVE POWER—NON-DELEGATION DOCTRINE—JUDICIAL INTERPRETATION.

*Although neither the Federal Constitution nor any state constitution explicitly provides that the legislative power cannot be delegated, the non-delegation doctrine has been written into our constitutions by judicial interpretation.*

6. CONSTITUTIONAL LAW—DELEGATION OF LEGISLATIVE POWER.

*Judicial invalidation of legislative delegations must ultimately be attentive to the important distinctions as to that power which is exclusively legislative and thus non-delegable and should be assessed in terms of the practical needs of effective government.*

7. STATUTES—DELEGATION OF LEGISLATIVE POWER—LEGISLATIVE WILL —CONSTITUTIONAL LAW.

*The substance of the legislation as embodying a complete ex-*

*pression of the legislative will is the resolvent of the question of delegation of legislative power and not the form of the legislative action or the nature of the contingency in question.*

8. STATUTES—MENTAL HEALTH—RETARDED PERSONS—PAYMENT FOR CARE—LIABILITY OF RELATIVES—FEDERAL LAW—DELEGATION OF LEGISLATIVE POWER.

*Statute determining monthly liability of a responsible relative of a mentally retarded person admitted to a public institution by incorporating future Federal income tax legislation constituted a permissible delegation of legislative power since it was a means of effectuating a legislative plan, a controlling judgment made by that body, and was made for convenience to the taxpayer and simplicity of administration (MCLA § 330-.651 et seq.).*

9. ADMINISTRATIVE LAW—DELEGATED LEGISLATIVE AUTHORITY—ARBITRARINESS—FEDERAL STATUTES.

*A prominent reason for invalidation of legislative authority delegated to an administrative body—to protect against arbitrariness—is largely inapplicable when the legislative intent is to incorporate future Federal statutes.*

10. CONSTITUTIONAL LAW—DELEGATED LEGISLATIVE AUTHORITY—LEGISLATURE—STATUTES—REGULATIONS.

*Decisive on the question of improper delegation of legislative authority is a conideration of whether, in the light of the practicalities of the situation, the legislature has in fact abdicated its powers, or has instead exercised its controlling judgment and, in pursuance of its adopted policy, chosen to refer to other acts or regulations.*

11. MENTAL HEALTH—PUBLIC INSTITUTIONS—RETARDED PERSONS—PAYMENT FOR CARE—LIABILITY OF RELATIVES—FEDERAL INCOME TAX—PROBATE COURTS—LEGISLATIVE POWERS.

*No abdication of legislative powers is found in the legislation in which the legislature has chosen to determine the monthly liability of a responsible relative for mentally retarded persons admitted to a public institution, as the ultimate and controlling policy decisions were dictated by the legislature by determining, upon its own reasons and sole responsibility, the necessity for uniformity across the state for the support of those persons; the desirability of attaching liability to certain designated responsible relatives; and the expediency of determining in the first instance the controlling standard of*

*"ability to pay" by a specified percentage of a relative's net taxable income figure as disclosed on the last Federal income tax return, subject to redetermination by the probate court (MCLA § 330.651 et seq.).*

12. CONSTITUTIONAL LAW—LEGISLATURE—LEGISLATIVE POWER—INTERNAL REVENUE CODE.

*It is wholly unrealistic to contend that the legislature, in choosing to use an income figure which would reflect prospective changes in the complex provisions of the Federal Internal Revenue Code, "abdicated" its legislative power in favor of the Federal Congress; as there was, rather, an exercising of legislative power coupled with a permissible delegation to, in a sense, "fill up the details" of the broad policy of the statute requiring certain relatives to pay for the support of a mentally retarded person admitted to a public institution (MCLA § 330-.651 et seq.).*

13. STATUTES—DELEGATED LEGISLATIVE AUTHORITY—ADMINISTRATIVE LAW—CONGRESS.

*Delegation to an administrative agency with a charge "fill up details" is true delegation of legislative power because the agency is expected to "legislate" within the bounds of the legislative guidelines established, while "delegation" to the Federal Congress is different in that there is no "filling up details" in the sense that the Congress is in any way charged with the responsibility of carrying out Michigan legislative policy.*

14. CONSTITUTIONAL LAW—LEGISLATURE—FEDERAL INTERNAL REVENUE CODE—NET TAXABLE INCOME.

*The legislative decision to accept future changes of the definition of net taxable income in the Federal Internal Revenue Code, "sight unseen", is a reasonable decision in light of the existing scheme of that code and the improbability that any substantial change in the theory and substance of the congressional concept of net taxable income will come to pass without ample opportunity for Michigan legislative action to effect a timely dissolution of the partnership of the state and Federal statutes (MCLA § 330.651 et seq.).*

15. STATUTES—FOREIGN LEGISLATION—INCORPORATION BY REFERENCE —CONSTITUTIONAL LAW—DELEGATION OF LEGISLATIVE POWER.

*A statute which prospectively recognizes future amendments to existing foreign legislation incorporated by reference in the statute does not constitute an unconstitutional delegation of*

*legislative power where the prospective recognition is only incidental to the administration of the statute and where the prospective recognition constitutes a legislative policy decision that continuing uniformity with the foreign legislation is desirable and not likely to frustrate the purpose of the statute.*

16. Constitutional Law—Delegated Legislative Power—Mental Health—Public Institutions—Retarded Persons—Payment for Care—Liability of Relatives—Federal Internal Revenue Code.

*The prospective legislative recognition of future amendments to the Federal Internal Revenue Code as a part of the overall scheme of the statute which requires certain relatives to reimburse the state for the maintenance and care of mentally retarded persons admitted to public institutions and provides that the amount of monthly liability of a responsible relative is to be originally determined by the use of a schedule which associates a monthly liability with the relative's net taxable income appearing on a submitted Federal income tax return is a constitutional delegation of legislative power (MCLA § 330.651 et seq.).*

17. Constitutional Law—Equal Protection.

*Identical standards regarding equal protection of the laws are applicable to both the Federal and our state Constitutions.*

18. Statutes—Reasonableness of Classification.

*The reasonableness of a given statutory classification is to be examined with reference to the purpose for which the statute was enacted.*

19. Mental Health—Public Institutions—Retarded Persons—Payment for Care—Liability of Relatives—Statutes—Purpose.

*The purpose of the act requiring relatives to reimburse the state for the maintenance and care of mentally retarded persons admitted to public institutions is to charge those of sufficient ability to reimburse the state in a reasonable manner (MCLA § 330.651 et seq.).*

20. Statutes—Constitutional Law—Classification—Arbitrary Classification.

*The finding that a given classification could, in certain limited instances, operate without complete uniformity and not fulfill the purpose for which a statute was enacted is not in itself dispositive of the question of its constitutionality, since reason-*

*ableness of legislative classification is not dependent on complete equality of the chosen standard and the existence of minor inequalities over a class does not amount to arbitrariness · in the classification.*

21. MENTAL HEALTH—CONSTITUTIONAL LAW—PUBLIC INSTITUTIONS—RETARDED PERSONS—PAYMENT FOR CARE—LIABILITY OF RELATIVES—EQUAL PROTECTION.

*The mere possibility that a few wealthy citizens could, availing themselves of the economic incentive provisions of the Internal Revenue Code, reduce their net taxable income thus understating their ability to pay for purpose of reimbursement under the statute requiring relatives to reimburse the state in part for the maintenance and care of mentally retarded persons admitted to public institutions does not render the criterion selected arbitrary and violative of equal protection (MCLA § 330.651 et seq.).*

22. MENTAL HEALTH—PUBLIC INSTITUTIONS—RETARDED PERSONS—REDETERMINATION OF LIABILITY—CONSTITUTIONAL LAW—EQUAL PROTECTION.

*A finding that there is no denial of equal protection of the laws, in the provisions of the act requiring relatives to reimburse the state for the maintenance and care of mentally retarded persons admitted to public institutions, is supported by the factor that any inequality resulting from the original determination of liability could be minimized by the redetermination expressly provided for in that act (MCLA § 330.651 et seq.).*

23. MENTAL HEALTH—PUBLIC INSTITUTIONS—RETARDED PERSONS—LIABILITY OF RELATIVES—CONSTITUTIONAL LAW—EQUAL PROTECTION.

*The act requiring certain relatives to reimburse the state for the maintenance and care of mentally retarded persons admitted to public institutions satisfies the minimum constitutional requirements of equal protection since it produces generally fair results and establishes a classification which bears a reasonable relationship to the object of the enacted legislation (MCLA § 330.651 et seq.).*

24. ADMINISTRATIVE LAW—HEARING—CONSTITUTIONAL LAW—DUE PROCESS—PROPERTY RIGHTS.

*Absence of notice and a hearing before an administrative agency prior to a determination of liability by that agency does not*

*contravene constitutional due process requirements when property rights are involved.*

25. ADMINISTRATIVE LAW—HEARING—REVIEW—DUE PROCESS.
   *Allowing a hearing before the making of an administrative determination is not essential if thereafter there is adequate opportunity for administrative or judicial review.*

26. MENTAL HEALTH—PUBLIC INSTITUTIONS—RETARDED PERSONS— PAYMENT FOR CARE—LIABILITY OF RELATIVES—PROBATE COURT— APPEAL AND ERROR—TRIAL DE NOVO.
   *Since the probate court is not in any sense an appellate court, the word "appeal" as used in the statute requiring relatives to reimburse the state for the maintenance and care of mentally retarded persons admitted to public institutions means a trial de novo in the probate court (MCLA § 330.660).*

27. MENTAL HEALTH—RETARDED PERSONS—PAYMENT FOR CARE— LIABILITY OF RELATIVES—STATUTES—ADMINISTRATIVE LAW—JUDICIAL REVIEW—DUE PROCESS.
   *The statute requiring relatives to reimburse the state for the maintenance and care of mentally retarded persons admitted to public institutions makes ample provision for judicial review of the initial administrative determination of liability and the availability of such review cures the initial denial of an administrative hearing and satisfies procedural due process requirements (MCLA § 330.651 et seq.).*

Appeal from Court of Appeals, Division 1, Lesinski, C. J., and Holbrook and Levin, JJ., affirming Wayne, Carl M. Weideman, J. Submitted March 10, 1970. (No. 20 January Term 1970, Docket No. 52,529.) Resubmitted June 22, 1971. (No. 34 June Term 1971, Docket No. 52,529.) Decided July 7, 1971.

18 Mich App 145 affirmed.

Complaint by Donald A. Miller and Geraldine B. Miller against the State of Michigan, Department of Revenue, for a determination that Act 335 of the Public Acts of 1965, regarding the liability of rela-

tives for the care and maintenance of mentally retarded persons in public institutions, is unconstitutional and for an injunction to prevent its enforcement. Summary judgment for plaintiffs. Defendant appealed to Court of Appeals. Affirmed. Defendant appeals. Affirmed.

*Donald A. Miller,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *William D. Dexter, Richard Roesch,* and *James B. Saunders,* Assistant Attorneys General, for defendant.

*Amicus Curiae:* Michigan Association of Retarded Children by *Strom & Hoehn* (*Thomas L. Butch,* of counsel).

ADAMS, J.   A summary judgment of unconstitutionality of PA 1965, No 335, was entered by the circuit judge on December 11, 1967.[1]   Then, as now, admission to a state mental institution might result from a court-ordered commitment[2] based on proceedings initiated by persons not related to the handicapped person, the statute providing:

---

[1] The title of PA 1965, No 335, describes the act as "relating to the liability of relatives for the care and maintenance of mentally retarded persons admitted to public institutions;   *   *   *   ."

Section 1 of the act, as originally enacted, defined a mentally retarded person to mean "a mentally handicapped person, including a moron, idiot, imbecile, and any person as to whom congenital defects have produced the same deficiency."

PA 1966, No 77, amended § 1 to include any epileptic admitted to the Caro State Hospital for Epileptics.

The title was amended and a new section added by PA 1969, No 228, to impose additional liability under the act for the care and maintenance of mentally ill children.

[2] By statute, except in certain specified situations, the Commissioner of Revenue ex officio shall be the public guardian of every patient admitted to a State mental institution.   MCLA § 330.21b (Stat Ann 1969 Rev § 14.811[1]).

"The father, mother, husband, wife, brother, sister, child, if the petitioner be of legal age, or guardian of a person alleged to be mentally ill, mentally handicapped or epileptic, or the sheriff or supervisor of any township, or county agent, or by any other person whom a judge of probate, upon examination into the facts and circumstances of any particular case, shall determine would be a proper person to make such petition, or. any peace officer within the county in which such alleged mentally diseased person resides, or may be, may petition the probate court of said county for an order directing the admission of said person to a hospital, home or institution for the care of the mentally ill, mentally handicapped or epileptic, such petition to contain a statement giving the facts and not the conclusions upon which the allegation of such mental disease is based and because of which the application for the order is made." MCLA § 330.21 (Stat Ann 1969 Rev § 14.811.)[3]

Pursuant to statute,[4] the state determines the charge for the care and treatment of mental patients in state hospitals by an average daily rate which may not exceed the anticipated operating cost, exclusive of capital outlay. The amount is fixed at the beginning of each fiscal year.[5] Section 6 of the act under challenge here in part provides:

"Within 30 days after admission of the patient or the effective date of this act, whichever is later, the relative shall file the signed, completed form with the department of revenue. * * * The department of revenue *shall bill* the relative for the amounts of liability determined under the provi-

---

[3] MCLA § 330.21 (Stat Ann 1969 Rev § 14.811) has been amended by PA 1969, No 110, PA 1970, No 69, and PA 1970, No 210.—RE-PORTER.

[4] MCLA § 330.41 (Stat Ann 1969 Rev § 14.831).

[5] The fiscal year of the State commences on July first and closes on June thirtieth. MCLA § 21.91 (Stat Ann 1969 Rev § 3.561).

sions of this act from the date of admission of the patient or the effective date of this act, whichever is later, through the succeeding June 30." (Emphasis added.)

The above provision obviously refers to the initial filing by the responsible relative and the resultant initial billing period by the State.

Section 7 of the act sets forth the requirements of the original form and the accompanying information in these words:

"The form shall contain the name of the patient; the name of the institution to which the patient has been admitted; the name and address of the relatives liable for the care and maintenance of the patient under the provisions of this act; the schedule of liability set forth in section 8; the net taxable income of the relative *last reported to the United States internal revenue service for federal income tax purposes;* the names and ages of dependents of the relatives; and such other information as may be required by rules adopted by the department of revenue." (Emphasis added.) MCLA § 330.657 (Stat Ann 1969 Rev § 14.870 [107]).

Section 8 provides in part:

"(1) The amount of monthly liability of a relative for the care and maintenance of a mentally retarded person under the provisions of this act shall be originally determined by use of the following schedule:

| Net Taxable Income | Monthly Liability | Net Taxable Income | Monthly Liability |
|---|---|---|---|
| $  0 to 4,999 | 0 | *** | |
| 5,000 to 5,499 | 20 | 19,000 to 19,499 | 190 |
| 5,500 to 5,999 | 25 | 19,500 to 19,999 | 200 |
| *** | | 20,000 and over | 210." |

When these sections are compared, it is clear the legislature intended that the "net taxable income"

to be used in determining monthly liability under the schedule appearing in § 8 of the act is the same amount prescribed by § 9 of the act, which is as follows:

"By May 1 of each year the department of revenue shall send a renewal form to all relatives liable for the care and maintenance of a patient under the provisions of this act. *The renewal form shall contain the same information as the original form but shall include the most recent information concerning the net taxable income of the relative and be accompanied by a signed copy of the relative's income tax return submitted to the United States internal revenue service.* The renewal form and the signed copy of the return shall be filed with the department of revenue by the succeeding June 1. *The department of revenue shall reascertain the amount of liability under the provisions of this act and bill the relative accordingly* for the period commencing on the succeeding July 1 and continuing through the following June 30. Payments by the relative shall be made as if the patient were first admitted on July 1." (Emphasis added.) MCLA § 330.659 (Stat Ann 1969 Rev § 14.870 [109]).

Section 10 of PA 1965, No 335, authorizes a responsible relative to request at any time a new determination of liability by the Department of Revenue. The statute continues:

" * * * For purposes of the determination, the department of revenue may request the relative to supply all relevant financial information and such additional information as may be provided by rules of the department of revenue. After review of the information, the department of revenue shall establish the monthly liability of the relative. If the relative is dissatisfied with the determination, he may appeal the determination to the probate court of the

county of residence of the patient.   The probate court shall then determine the liability.   In no case may the liability determined by the department or by the probate court exceed that established by the schedule.   Appeals from the determination of the probate court may be made as in other cases." MC-LA § 330.660 (Stat Ann 1969 Rev §14.870 [110]).

The deficiency of this legislation is glaring.   No provision is made for notice of hearing.   There is no statutory designation of a hearing officer or examiner to make a determination either from evidence or the submitted information.  *Detroit Edison Company* v. *Corporation & Securities Commission* (1960), 361 Mich 150.   The statute contains no legal requirements or provisions to be applied to the facts by the Department of Revenue in redetermining liability.   It operates with an uncontrolled discretion.   There are no legislative standards or guidelines for the exercise of the rulemaking power. *Osius* v. *St. Clair Shores* (1956), 344 Mich 693; *McKibbin* v. *Corporation & Securities Commission* (1963), 369 Mich 69; *Fowler* v. *Board of Registration in Chiropody* (1965), 374 Mich 254; *Milford* v. *People's Community Hospital Authority* (1968), 380 Mich 49.[6]

---

[6] For a discussion of the administrative function in this area, see *Handlon* v. *Belleville* (1950), 4 NJ 99, 105 (71 A2d 624, 16 ALR2d 1118, 1123), where it was said:

"The requirement of a 'hearing' has reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts and the issue determined uninfluenced by extraneous considerations which might not be exceptionable in other fields involving purely executive action.   The 'hearing' is 'the hearing of evidence and argument.'   *Morgan* v. *United States,* 298 US 468, 56 S Ct 906, 80 L Ed 1288 (1936); *Shields* v. *Utah Idaho Cent. R. Co.,* 305 US 177, 59 S Ct 160, 83 L Ed 111 (1938); *Pennsylvania R. R. Co.* v. *New Jersey Aviation Commission,* 2 NJ 64 [65 A2d 61] (1949). The quality of the act rather than the character of the agency exercising the authority is determinative of the nature of the power and the need for procedural due process."

I would affirm the trial court and the Court of Appeals. No costs, a public question being involved.

T. M. KAVANAGH, C. J., and BLACK and SWAINSON, JJ., concurred with ADAMS, J.

T. E. BRENNAN, J., (*dissenting*).

## THE FACTS

Plaintiffs are the parents of Thomas L. Miller, a mentally retarded child formally committed to the Lapeer State Home and Training School on January 24, 1957, as a public-pay patient. The commitment was authorized by the probate court of Wayne County. This action was commenced by plaintiffs after the enactment of PA 1965, No 335,[1] requiring certain relatives to reimburse the State of Michigan in part for the money expended for the maintenance and care of a mentally retarded child. A complaint against the Department of Revenue was filed in the circuit court for the County of Wayne, alleging that PA 1965, No 335, was unconstitutional and requesting relief from its threatened enforcement. In a summary judgment dated December 11, 1967, the circuit court held the act unconstitutional on various grounds;[2] the Court of Appeals affirmed the circuit

[1] MCLA § 330.651 *et seq.* (Stat Ann 1965 Cum Supp § 14.870[101] *et seq.*). The effective date of the act is January 1, 1966, § 16.

[2] The circuit court predicated its finding of unconstitutionality on five grounds : (1) the Lapeer State Home is a tax-supported institution and a requirement of reimbursement from the relatives of a mentally retarded person constitutes a higher rate of taxation for those relatives denying them equal protection of the laws; (2) the State of Michigan is required to foster and support institutions for the care and treatment of mentally retarded persons by the Constitution of 1963, art 8, § 8, and this requires the furnishing of state services at no cost; (3) the requirement of the act that a responsible relative furnish the state with a signed copy of his or her Federal income tax return is prohibited on constitutional grounds; (4) the payment schedule set forth in the act, exempting

court, but on different grounds.[3]   It held PA 1965,
No 335, unconstitutional because (1) it found that a
formula of reimbursement which is keyed to the net
taxable income as shown on a Federal income tax
return is in conflict with the equal protection clause
of the Michigan Constitution of 1963, since certain
actual income of a taxpayer is not required to be
included in the computed net taxable income for
Federal income tax purposes; and (2) the determi-
nation of net taxable income of the responsible rela-
tive under the act is controlled by the Congress of
the United States and the use of this standard by
the Michigan legislature constitutes an unconstitu-
tional delegation of legislative power to the Con-
gress.[4]   We granted leave to appeal.[5]

## THE STATUTORY PROVISIONS

Public Act 335 was enacted in 1965 and is entitled
"Liability of Relatives of Institutionalized Mentally
Retarded Persons."[6]   The act imposes an absolute
obligation to pay upon the husband, wife, father and
mother of an institutionalized mentally retarded
person.[7]   Once the mentally retarded person is ad-

---

persons with annual net taxable income under $5,000 as well as
certain other persons violates equal protection of the laws; (5)
the act unconstitutionally delegates judicial power to an admin-
istrative agency to make determinations of liability and involves
a taking of property without due process of law.

[3] 18 Mich App 145; Judge LEVIN wrote a dissenting opinion.

[4] The Court of Appeals also implied that PA 1965, No 335, is un-
constitutional because it fails to provide for a notice of hearing and
a hearing to determine in the first instance the liability of the rela-
tive, and hence is violative of procedural due process.

[5] 382 Mich 775.

[6] "AN ACT relating to the liability of relatives for the care and
maintenance of mentally retarded persons admitted to public in-
stitutions; and to prescribe the powers and duties of certain public
officers."

[7] "Sec. 4.   The husband, wife, father and mother of a mentally
retarded person shall jointly and severally be liable to the state
for the care and maintenance of the committed mentally retarded

mitted to an institution under the jurisdiction of the Department of Mental Health, each liable relative is required to provide the Department of Revenue with a signed copy of his most recent income tax return filed with the United States Internal Revenue Service.[8] The Department of Revenue then originally determines the amount of monthly liability of the relative in accordance with a graduated schedule set forth in the act.[9] Failure or refusal to file the necessary forms (including the Federal income tax return) results in an imposition of maximum monthly liability under the act.[10] If a relative believes the monthly liability as determined by the schedule does not reflect his current income status or his ability to pay, he may request a redetermination of his monthly liability by the Department of Revenue.[11]

---

person until he is 21 years of age or until he has been a patient in a public institution for a total period of 15 years, whichever first occurs."

[8] "Sec. 6. Within 30 days after admission of the patient or the effective date of this act, whichever is later, the relative shall file the signed, completed form with the department of revenue. The form shall be accompanied by a signed copy of the relative's most recent income tax return submitted to the United States internal revenue service. The department of revenue shall bill the relative for the amounts of liability determined under the provisions of this act from the date of admission of the patient or the effective date of this act, whichever is later, through the succeeding June 30."

[9] "Sec. 8. (1) The amount of monthly liability of a relative for the care and maintenance of a mentally retarded person under the provisions of this act shall be originally determined by use of the following schedule: * * * ." See 18 Mich App 151, where the statutory schedule is set forth in full.

[10] "Sec. 11. (2) If a liable relative fails to file a form, the monthly liability of the relative is deemed to be $210.00."

[11] "Sec. 10. If the relative believes that the monthly liability as determined by the schedule does not accurately reflect his current income status or his ability to pay due to changed circumstances or otherwise, the relative may request at any time a determination of liability by the department of revenue. For purposes of the determination, the department of revenue may request the relative to supply all relevant financial information and such additional information as may be provided by rules of the department of revenue. After review of the information, the department of rev-

The department may then require the relative to furnish all relevant financial information and such additional information as may be provided by rules of the Department of Revenue.[12] If dissatisfied with this determination of liability, the responsible relative may then appeal to the probate court of the county of residence of the patient.[13] If a relative liable under the act fails to pay the assessed monthly liability, and no appeal is pending before the probate court, the Commissioner of Revenue may petition the probate court to issue an execution in the amount due.[14]

I consider seriatim three arguments advanced by plaintiffs attacking the constitutionality of the instant legislation.

---

enue shall establish the monthly liability of the relative. If the relative is dissatisfied with the determination, he may appeal the determination to the probate court of the county of residence of the patient. The probate court shall then determine the liability. In no case may the liability determined by the department or by the probate court exceed that established by the schedule. Appeals from the determination of the probate court may be made as in other cases."

[12] *Ibid.*

[13] *Ibid.*

[14] "Sec. 11. (1) If a relative liable under this act for the care and maintenance of a patient fails to pay the amount due, the commissioner of revenue may petition the probate court of the county of residence of the patient and thereupon the court may forthwith issue an execution in the amount so stated and the same shall be directed to any sheriff or constable of any county in the state or the commissioner of Michigan state police. An execution shall not be issued by the probate court if an appeal as provided by section 10 is pending before the probate court and shall not be issued until at least 15 days from the final determination of the appeal by the probate court and the final determination of the court is not obeyed by the relative. In addition the commissioner of revenue may bring an action at law wherever the liable relative resides or may be found to recover the amount of payments which the liable relative is delinquent in paying. Before the commissioner of revenue can bring his action of law under this section, he shall be required to show that the relative liable under this act was notified by certified mail of his liability and that a period of at least 15 days has lapsed between the notification date and the date of commencement of action as provided by this section. The costs of such proceedings shall be assessed against the relative only if the relative is held liable under the provisions of this act."

## I

### Does the Michigan Reimbursement Statute Delegate Legislative Power to the Federal Congress?

Plaintiffs contend that the act embodies an unconstitutional delegation of legislative power, since it involves an attempt by the Michigan legislature to incorporate future Federal legislation. The act provides that any relative liable for the care and maintenance of an institutionalized retarded child must file an informational form with the department of revenue.[15] This form must contain, among other things, "the net taxable income of the relative *last reported* to the United States internal revenue service for Federal income tax purposes."[16] Section 8 of PA 1965, No 335, provides that the amount of the monthly liability of a responsible relative for the care and maintenance of a mentally retarded person in a state hospital is to be *originally determined* by the use of a schedule which associates a monthly liability with the relative's net taxable income appearing on the submitted Federal income tax return.[17] The Court of Appeals held that these provisions amounted to a delegation to the United States Congress of the ultimate determination of the amount of reimbursement in violation of the requirements of constitutional due process.

I disagree. It is well settled that incorporation by reference of an existing Federal law in a state statute does not render that statute constitutionally infirm; beyond a doubt,

" * * * a state legislature does not invalidly delegate its legislative authority by adopting a law

[15] See § 6 of the act, set forth in fn 8, *supra*.
[16] MCLA § 330.657 (Stat Ann 1969 Rev § 14.870[107]).
[17] MCLA § 330.658 (Stat Ann 1969 Rev § 14.870[108]).

or rule of Congress, if such law is already in existence or operative." 16 Am Jur 2d, Constitutional Law § 245, p 496.

In *Dearborn Independent, Inc.,* v. *City of Dearborn* (1951), 331 Mich 447, 455, we noted that a state statute which adopts existing statutes, rules or regulations of Congress by reference does not involve an unconstitutional delegation of legislative power. Yet plaintiffs contend that the language in PA 1965, No 335, discloses a clear legislative intent to incorporate future Federal legislation and thus unconstitutionally delegates legislative power to Congress, in violation of art 4, § 1 of the Michigan Constitution of 1963, vesting legislative power in " * * * a senate and house of representatives."

Although neither the Federal Constitution nor any state constitution explicitly provides that the legislative power cannot be delegated, the non-delegation doctrine has been written into our constitutions by judicial interpretation. The basis for this judge-made rule rests on two independent grounds. First, the doctrine has been developed and applied by the courts as a corollary to the principle of separation of powers. But it has been pointed out that the doctrine of separation of powers of government does not stand in the way of all attempted delegations by the legislature of the legislative power.[18]

---

[18] See, *e.g.*, the discussion in Weeks, *Legislative Power Versus Delegated Legislative Power*, 25 Geo L J 314 (1935). From the standpoint of history as well as theory, it is not correct to assume that the constitutional principle of separation of powers precludes all delegations of what is termed "legislative" power. Thus, despite Locke's attempts to segregate the law-making function, " * * * concessions of the formulators of the doctrine of separation of powers were made to tradition, practice, and expediency * * * ." *Id.* at pp 321, 322. *"Thus, while separation of the legislative power from the other powers is adhered to as a principle, as the legislative power is defined it is broadly comprehensive."* (Emphasis added.) *Id.* at p 322. This statement is in accord with Justice Marshall's dictum (quoted *infra*)

The origin of the non-delegation doctrine has been traced also to a maxim of agency, *delegata potestas non potest delegari, i.e.,* that each department of government being itself a delegate could not therefore delegate. The soundness of that maxim as a principle of constitutional law has been questioned.[19] One writer, discussing that agency principle in the context of the delegation question, has concluded: " * * * it is entitled to some respect as a broad assertion of principle if rightly limited and understood. As an exact and universal statement, it is false."[20] And one eminent authority has stated that the *origins* of the principle " * * * *can hardly aid the solution of twentieth-century problems of delegation.*" (Emphasis added.) Davis, Administrative Law Treatise (1958), § 2.02, p 79.

Yet, whatever the theory behind the non-delegation doctrine, it has been noted that the divergence between theory and holding in decisions dealing with the issue of delegation of legislative powers is immense.[21] Both in Federal and state courts,

that only those powers which are *exclusively legislative* are non-delegable. Compare Cheadle, *The Delegation of Legislative Functions,* 27 Yale L J 892, 896 (1918): " * * * the legislative branch being inherently a duty-assigning branch may, in the teeth of the maxim, assign such duties and functions to others as it is not, for some other reason, prohibited from assigning or they from receiving, even though itself a body of delegated and even limited powers; without such ability the power would be barren and incomplete."

[19] Duff and Whiteside, *Delegata Potestas Non Potest Delegari, A Maxim of American Constitutional Law,* 14 Cornell L Q 168, 196 (1929): "The whole doctrine, insofar as it is asserted to be a principle of constitutional law, is built upon the thinnest of implication, or is the product of the unwritten super-constitution."

[20] Cheadle, *The Delegation of Legislative Functions,* 27 Yale L J 895, 896 (1918).

[21] 1 Davis, *Administrative Law Treatise* (1958), § 2.07, p 103: "The verbal formulations to which the state courts pay lip service have been mostly without substance. To find the effective law, one must look past the theory to the holdings. The correlation between the theory and the holdings is characteristically low, and when it is high the *holdings have been unfortunate when examined in the light of the practical needs of effective government.*" (Emphasis added.)

dicta on the non-delegation doctrine are frequent. Thus, although the United States Supreme Court has stated "That the legislative power of Congress cannot be delegated is, of course, clear," *United States* v. *Shreveport Grain & Elevator Co.* (1932), 287 US 77, 85 (53 S Ct 42, 77 L Ed 175), Davis has stated that " * * * the Supreme Court has *specifically upheld scores of delegations of legislative power.*" (Emphasis added.)   Davis, *supra*, § 2.02, p 77.   On the state level, the dictum of an Ohio court has often been repeated: "The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law." *Cincinnati W. & Z. R. Co.* v. *Commissioners of Clinton County* (1852), 1 Ohio St 77, 88.

In sharp contrast, one court has noted:

"[T]here is an overpowering necessity for a modification of the doctrine of separation and non-delegation of powers of government * * * . The public interest would be greatly advanced and our law clarified, if the situation as it now exists were frankly recognized * * * . *State ex. rel. Wisconsin Inspection Bureau* v. *Whitman* (1928), 196 Wis 472, 498, 506 (220 NW 929)."[22]

---

Professor Davis' discussion of the non-delegation doctrine is, of course, made in reference to the delegation of legislative powers to an administrative body, only one "type" of legislative delegation, whereas in the instant case the legislation is attacked as an unconstitutional delegation to the Federal government. But the same issues govern the variant types of legislative delegation, namely, the extent to which the legislative power is constitutionally delegable and the criteria to be used in determining whether a given delegation is excessive.

[22] See, also, *Weeks, supra,* fn 18 at p 332.

"For the courts to persist in maintaining the rule of non-delegation means that they approach, if they do not enter, the realm of legal sophistry; they are merely upholding the letter of our constitutions

But the undeniable fact is that state courts have upheld such delegations frequently, and Professor Davis has concluded, after an analysis of numerous decisions, both state and Federal: " * * * the assertion that *authority as to what the law shall be is not delegable is clearly false."* (Emphasis added.) Davis, *supra,* § 2.02, p 78. He cites with approval a distinction once made by an eminent jurist but all too often disregarded in later decisions:

" 'It will not be contended that Congress can delegate to the courts, or to any other tribunal, powers which are *strictly and exclusively legislative.* But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself * * * . *The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details.'* If the Supreme Court had consistently followed this lead, the law of the subject might be much   more   satisfactory."   (Emphasis   added.) Chief Justice Marshall in *Wayman* v. *Southard* (1825), 23 US (10 Wheat) 1 (6 L Ed 253), quoted in *Davis, supra,* § 2.02, p 80.

Judicial invalidation of legislative delegations must ultimately be attentive to Justice Marshall's important distinctions as to that power which is "exclusively legislative" and thus non-delegable, and should be assessed in terms of the "practical needs of effective government."

Those practicalities were summed up, over three decades ago, in an incisive article dealing with the

_____

with the aid of a legal maxim which has been read into the documents."

"still unsettled constitutional issue" of delegated legislative power:

"In short, *it is futile for the legislature any longer to attempt to work out the details of large legislative changes.* Statutes cannot be altered or repealed as rapidly as justice may demand in a complex world in which the state must constantly assume a greater part. If statutes are made under such conditions to embrace the whole of a legislative policy, they will be hopelessly cumbersome and prolix." (Emphasis added.)   Weeks, *Legislative Power Versus Delegated Legislative Power,* 25 Geo L J 314, 316 (1935).

Turning from the origins and theory of the nondelegation doctrine to the case law in this area, there is some early authority supporting the constitutionality of tax statutes ascertaining charges to be made on the basis of variable foreign legislation. In *People, ex rel. Pratt* v. *Goldfogle* (1926), 242 NY 277 (151 NE 452), the court rejected the contention that a tax statute was unconstitutional because the property subject to tax was in part dependent on future congressional acts:

"The first claim rests upon the reasoning that the Legislature has abdicated its powers and violated the Constitution by providing that the capital to be taxed must be in competition with the business of National banks and which business may be enlarged or diminished by act of Congress, thus giving to that body the indirect power to determine what shall be the subject of this taxation. We are unable to accept this view which seems extreme and untenable. If we are right, as we have no doubt we are, that the Legislature had the power to classify the particular kind of property to be taxed by this statute in part by reference to the uses in which it was employed, the exercise of that right would not

be invalidated because the use thus described might thereafter be changed or enlarged by custom, usage or Federal statutory provision. *The Legislature does not surrender any of its essential and constitutional powers. It declares the taxation, fixes the rate and describes the property to be taxed and in doing this we believe it had the right to make its classification and description of the property flexible so that they would be adjustable to conditions thereafter arising rather than that it was compelled to adopt a new statute every time that some change in the business to be transacted by National banks was made. The classification and description are complete; the extent of the property to be included within the classification may be changed but that is a minor incident."* (Emphasis added.) Pp 291, 292.

Thus, the court held that the delegation was a *constitutional* one, since the state legislature had not in fact abdicated any of its "essential" powers; the legislation made for convenience to the taxpayer and economy to the state in avoiding the necessity of setting up a separate standard.

The question of constitutional delegation raised in the context of a tax statute fixing rates dependent on future determinations of other bodies has also been persuasively resolved on the theory that the foreign law is the contingency upon which the domestic law becomes operative. In *The People* v. *Fire Association of Philadelphia* (1883), 92 NY 311, the New York legislature levied a tax on foreign insurance companies doing business in New York based on the amount of tax as presently or prospectively determined by the state of the companies' origin. The court squarely rejected the contention that there was any unconstitutional abdication of legislative authority in the legislatively-dictated scheme:

"[T]he legislature [has] the right to pass a law whose operation might depend upon, or be affected by, a future contingency.  *  *  *  'The event or change of circumstances on which a law may be made to take effect must be such as, in the judgment of the legislature, affects the expediency of the law; an event on which the expediency of the law in the judgment of the law-makers depends. *On this question of expediency the legislature must exercise its own judgment definitively and finally.'* The statute before us fully answers this description. It came from the hands of the legislature a complete and perfect law, having at once a binding force of its own, and dependent upon no additional consent or action for its vitality and existence. *The question of expediency involved in it was not delegated to any other tribunal, but settled definitively and finally by the legislature itself. It determined, as a conclusion proper and expedient, that foreign insurance companies, as the price of admission to our territory, should pay in taxes, license fees and the like precisely what the States which created them should impose upon our companies in excess of our usual rates as the price of admission to the foreign territory.* That was the whole question involved. Nothing else in the proposed law remained to be settled as expedient or otherwise, and that question the legislature determined for itself, upon its own reasons and its sole responsibility. *Neither the law nor its expediency depended upon the legislation of another State. It remained the law and its expediency was the same, whether the other States legislated or not.* If they did, the contingency arose which the law stood ready to meet; if they did not, it remained none the less the law, although no fact occurred to set it in operation." (Emphasis added.) Pp 316, 317.

Nor was the attempted delegation rendered unconstitutional by leaving the *amount* of the tax to the legislative discretion of another state:

"But the whole argument rests on the single point that the amount of the tax or fine imposed is not definitely fixed by the terms of the statute, but depends above a certain rate upon foreign legislation. Is it true that a fine or tax, cannot be imposed unless its amount be stated in the law? And that, if left to be determined by some other tribunal, thereby the legislative power has been delegated? Laws define a multitude of forbidden acts and impose fines and penalties not exceeding certain amounts, but below those amounts left wholly uncertain and committed to the discretion and judgment of judicial officers or tribunals. It is quite certain, therefore, that the legislature does not abdicate its functions and delegate its authority when it imposes a fine or penalty without itself fixing the amount, or when it leaves it to be fixed by some other tribunal. *But in the statute before us nothing is left to anybody's discretion. That is certain which can be rendered certain, and the act fixes the tax by reference to an extrinsic fact which determines its amount in excess of a fixed and established rate. Because that extrinsic fact is the legislation of another State, it does not follow that the legislative discretion of such other State is in any manner substituted for our own."* The People v. Fire Association of Philadelphia, supra, p 318. (Emphasis added.)

Even more persuasive was the court's analysis of the delegation question—an issue of constitutional dimension—as turning on the mere *form* which the legislature adopts to follow mutations in foreign laws:

"But if, when our statute was passed, there had been in existence a law of Pennsylvania, imposing upon New York companies a license fee of three per cent, and because of that fact our legislature had enacted that all Pennsylvania companies should pay

a license fee of three per cent, would that law have been a delegation of legislative authority to the State of Pennsylvania? Most clearly not, although the fact of the foreign law lay at the foundation of our legislative judgment and discretion. And if, within a month, the foreign law changed the impost to four per cent, and our own legislature, again ascertaining the fact, and because of it should change our tax to four per cent, would that be Pennsylvania legislation and not our own? And what would be certainly constitutional if done *seriatim,* by several and separate acts, does it become unconstitutional when the same precise and identical result, founded upon exactly the same legislative discretion, is accomplished by one? *If so, a grave constitutional question is made to turn upon the bare form instead of the substance of legislative action."* (Emphasis added.) *The People* v. *Fire Association of Philadelphia, supra,* pp 318, 319.

Thus, the fact of existing as well as prospective foreign law may occasion legislative action and prompt the exercise of legislative judgment and discretion. To forbid the legislature to follow mutations in foreign law by a single enactment is tantamount to *restricting* the exercise of that proper legislative discretion which is exclusively vested in that body. Of course, legislative recognition of the shifting character of foreign legislation does not in itself validate a delegation which is unwarranted and in substance amounts to a prohibited abdication of power. But, neither is such legislation *per se* invalid. To hold otherwise is to base fundamental constitutional questions on matters of form. So viewed, it is clear that the resolvent of the delegation question is not the form of the legislative action or the nature of the contingency in question, but rather the substance of the legislation as embodying a complete expression of the legislative will.

Notice should also be taken of the comparatively recent trend in decisions on the state level to uphold the constitutionality of legislative attempts to incorporate prospective changes in Federal statutes or administrative regulations. In the leading case of *Alaska Steamship Co.* v. *Mullaney* (CA9, 1950), 180 F2d 805, that state's income tax act was challenged as invalidly delegating legislative powers to Congress. The general scheme of the Alaska act was to incorporate by reference the internal revenue code "as now in effect or hereafter amended." After noting that the right to incorporate by reference provisions of the Federal law "now in effect" could not be questioned, the court continued:

"We do not overlook the fact that if the words 'or hereafter amended' were dropped from the Act, what remains would, in the long run, be unworkable under the legislative scheme here devised, for if the federal income tax requirements were changed substantially by future amendments, it would be impossible, administratively, to calculate the Alaska income tax merely by dividing the tax shown on the federal return by 10. * * *

"We think it is far from clear that any invalid delegation is attempted. There are of course many cases which have held attempts by a legislative body to incorporate provisions into its enactments by reference to future acts or amendments by other legislatures, to be invalid. But where it can be said that the attempt to make the local law conform to future changes elsewhere it [*sic*] not a mere labor-saving device for the legislators, but is undertaken in order to attain a uniformity which is in itself an important object of the proposed legislative scheme, there are a number of precedents for an approval of this sort of thing." P 816.

Two points emphatically made by that Court deserve similar emphasis here. First, since the broad

policy of conformity had properly been made by the state legislature—an *exclusively* legislative function —the clearly expressed intent of that body to incorporate future Federal legislation constituted a *permissible* delegation of legislative power. Second, the non-delegation doctrine was applied in recognition of the practical necessity for referring to future Federal laws, since it made for "convenience to the taxpayer and simplicity of administration". The delegation was a means of effectuating a legislative plan, a controlling judgment made by that body. Such considerations narrowly circumscribe the range of permissible legislative delegation, but clearly validate the attempted delegation in the instant case.

Similar legislation was upheld by the Supreme Court of Connecticut in *First Federal Savings & Loan Assn* v. *Connelly* (1945), 142 Conn 483 (115 A2d 455). Connecticut's corporation business tax incorporated the definition of gross income "as defined in the federal corporation net income tax *in force on the last day of the income year.*" In unanimously upholding the constitutionality of this provision as against plaintiff's contention that the provision constituted an unlawful delegation of legislative power to the Federal government, the court responded:

"This is not a delegation of legislative power but an incorporation by reference of the federal law into the state law. State law lays a tax on the franchise or privilege of a corporation to do business in this state. * * * The state legislature and not the Congress has selected net earnings as the base for determining the amount of this tax and has fixed the rate to be paid on that tax base. As a matter of convenience to the taxpayer and

economy to the state, the legislature has adopted some of the standards employed in the federal corporation net income tax law." 142 Conn 483, 493 (115 A2d 459, 460).

The reasoning and logic of the opinion echo the considerations so prominent in *Alaska Steamship Co.* v. *Mullaney, supra.*

Also in point is a unanimous decision of the Supreme Court of New Jersey, *State of New Jersey* v. *Hotel Bar Foods, Inc.* (1955), 18 NJ 115 (112 A2d 726). There the delegation question was raised in the context of a state statute which mandatorily directed a state superintendent to adopt future Federal regulations, and thus the legislation was attacked as an improper delegation of legislative power to Federal officials. Noting the trend toward liberalization of the legislators' power to delegate, the court said: (p 125)

*"The ultimate and controlling policy decision— as to whether there shall be uniformity of federal- state regulation in the field—rests always with the Legislature and it does not in any vicious sense abdicate its legislative judgment or authority."* (Emphasis added.)

The court then continued:

"Although the authorities are in substantial conflict, *there are reasoned decisions which tend to support the view (so highly desirable for current times) that a state legislature,* in dealing with products such as packaged foods (which generally travel in interstate commerce and are properly subject to extensive federal regulation), may constitutionally provide that its administrator's regulations shall be brought into conformity with pertinent federal regulations as they are duly promulgated and amended from time to time." (Emphasis added.)

Thus, whatever *form* the particular delegation may assume (*i.e.,* whether the attempt is to incorporate under authority of a state statute, as in *Mullaney,* or an administrative regulation, as in *Hotel Bar Foods*) is not decisive. Indeed, a prominent reason for invalidation of authority delegated to an administrative body—to protect against arbitrariness—is largely inapplicable when the legislative intent is to incorporate future Federal *statutes.* What is decisive on the question of improper delegation is rather a consideration of whether, in the light of the practicalities of the situation, the legislature has in fact abdicated its powers, or has instead exercised its controlling judgment and, *in pursuance of its adopted policy,* chosen to refer to other acts or regulations.

The logic of Chief Justice STARR in *People* v. *Sell* (1945), 310 Mich 305, is supportive of my position here. *Sell* involved a municipal ordinance permitting municipal prosecutions for violations of Federal price regulations as amended from time to time. In its opinion, the Court stated that the courts "have upheld many State laws which adopted Federal standards and regulations or which were designed to augment the enforcement of Federal laws or regulations" and that "it is clear that Michigan and many other States have recognized the *necessity* and *propriety of a mergence of action* and reciprocity of service for the common good between the two sovereign powers, the State and the Federal government." (Emphasis added.) *People* v. *Sell, supra,* 323, 325, 326. The Chief Justice cited with approval and quoted extensively from an article which detailed the numerous areas in which the states have adopted Federal administrative determinations. That article concludes, "In all of these there is an adoption of both existing and prospective federal

administrative determinations under existing federal legislation."[23]

For reasons of expediency and convenience, the legislature has chosen to determine the monthly liability of a responsible relative under PA 1965, No 335, by referring to the net taxable income figure appearing on the relative's last reported Federal income tax return. The plan is administratively simple and eminently pragmatic. I find in this legislation no abdication of legislative powers; instead, the ultimate and controlling policy decisions were dictated by the legislature. It determined, upon its own reasons and sole responsibility, the necessity of uniformity across the state in support of mentally retarded persons institutionally committed; the desirability of attaching liability to certain designated responsible relatives; the expediency of determining in the first instance the controlling standard of "ability to pay" to a specified percentage of a relative's net taxable income figure as disclosed on the last Federal income tax return, subject to redetermination of final liability by the probate court.

The scheme enacted in PA 1965, No 335, embodies the exercise of numerous definitive and final legislative judgments. It is thus wholly unrealistic to contend that the legislature, in choosing to use an income figure which would reflect prospective changes in the complex provisions of the Internal Revenue Code, "abdicated" its legislative power in favor of the Federal Congress; there was, rather, an exercising of legislative power coupled with a permissible delegation to, in a sense, "fill up the details" of that broad policy.[24]

---

[23] Comment, 33 Mich L Rev 597 (1935).

[24] In the context of legislative delegation to an administrative agen-

Delegation to an administrative agency with a charge to "fill up details" is true delegation. The agency is the creature of the legislature—its power to "fill up details" is intentionally granted—it is *expected* to "legislate" within the bounds of the legislative guidelines established. "Delegation" to the Congress is of a different sort. There is no "filling up details" in the sense that the Congress is in any way charged with the responsibility of carrying out Michigan legislative policy.

The legislature would, we can suppose, prefer that the Congress make no changes in the law, thus leaving the Federal definition of net taxable income exactly what it was on the date of the state enactment. The legislature merely recognizes that the Congress *may*, for reasons of its own, change its definition of net taxable income in the future.

The legislative decision to accept these future changes "sight unseen" is a reasonable decision in light of the existing scheme of the Federal Internal Revenue Code, and the improbability that any substantial change in the theory and substance of the congressional concept of net taxable income will come to pass without ample opportunity for Michigan legislative action to effect a timely dissolution of the partnership of the state and Federal statutes. And viewed with a regard for the practical needs of effective government, the logic of one early decision is strongly persuasive here:

"Possibly we may get nearer the ultimate point of the objection urged. That would seem to be that,

---

cy, Professor Jaffe has exploded the myth that giving the power to "fill up the details" does not constitute a delegation:

"Every student is aware that until recently, at least, courts somnambulistically insisted that the Constitution, having placed the legislative power in the legislature, forbade the delegation of lawmaking power." He cited the need for "practical limits" to the delegation of legislative power. Jaffe, *An Essay on Delegation of Legislative Power: II*, 47 Colum L Rev 561 (1947).

while the legislature might, by a series of separate acts, each passed because of a then existing foreign law, follow its changes, yet it cannot do so by one act which adopted and enacts such future and contingent mutations. This doctrine requires us to hold that a law, so framed as to follow and recognize the changes of foreign legislation, and thereby incorporate such changes into its own operation, is a delegation of the legislative power and therefore inadmissible. We have found no authority for such a broad and general proposition." *The People* v. *Fire Association of Philadelphia* (1883), 92 NY 311, 320.

I would hold that a statute which prospectively recognizes future amendments to existing foreign legislation incorporated by reference in the statute does not constitute an unconstitutional delegation of legislative power where the prospective recognition is only incidental to the administration of the statute and where the prospective recognition constitutes a legislative policy decision that continuing uniformity with the foreign legislation is desirable and not likely to frustrate the purpose of the statute. Judged by these criteria, I conclude that the prospective legislative recognition of future amendments to the Internal Revenue Code as a part of the overall scheme of PA 1965, No 335, is a constitutional delegation of legislative power.

## II

### Does the Reimbursement Statute Deny Equal Protection of the Laws by Imposing an Arbitrary Classification?

This Court has stated that identical standards regarding equal protection of the laws are applicable to both the Federal and our state Constitutions:

"The equality of rights protected by our constitution is the same as that preserved by the Fourteenth Amendment to the Federal Constitution." *Naudzius* v. *Lahr* (1931), 253 Mich 216, 222. The controlling standard has been clearly set forth in numerous decisions. In *Lindsley* v. *Natural Carbonic Gas Company* (1911), 220 US 61 (31 S Ct 337, 55 L Ed 369), the United States Supreme Court stated that a statutory classification is unconstitutional as violative of equal protection of the laws:

" * * * 1. * * * only when it is without *any* reasonable basis and therefore is purely arbitrary. 2. A classification having *some* reasonable basis does not offend against that clause merely because *it is not made with mathematical nicety or because in practice it results in some inequality.* 3. When the classification in such a law is called in question, if *any* state of facts reasonably can be conceived that would sustain it, the existence of that state of facts * * * must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon *any reasonable basis,* but is essentially arbitrary. * * * " (Emphasis added.)

Decisions of this Court have repeated those criteria. *Tracer* v. *Bushre* (1968), 381 Mich 282, *Naudzius* v. *Lahr, supra.* More recently, the United States Supreme Court has stated:

" ' * * * The applicable principles are that a state statute may not be struck down as offensive of equal protection in its schemes of classification unless it is obviously arbitrary, and that, except in the case of a statute whose discriminations are so patently without reason that no conceivable situation of fact could be found to justify them, the claimant who challenges the statute bears the burden of affirmative demonstration that in the actual state

of facts which surround its operation, its classifications lack rationality.' " *McGowan* v. *Maryland* (1961), 366 US 420, 535 (81 S Ct 1101, 6 L Ed 2d 393).

Moreover, the reasonableness of a given classification is to be examined with reference to the purpose for which the statute was enacted. In *Fox* v. *Employment Security Commission* (1967), 379 Mich 579, 588, this Court stated:

"However, the constitutional guarantees of equal protection are interposed against discriminations that are entirely arbitrary. In determining what is within legislative discretion and what is arbitrary, regard must be had for the particular subject of the State legislation. There must be a relation between the classification and the purpose of the act in which it is found." (Citation of authorities omitted.)

It remains to apply these well-established principles to the statute in question. The purpose of the act is to charge those of sufficient ability to reimburse the state in a reasonable manner. The amount of monthly reimbursement to be paid by a relative for the care of a mentally retarded person who has been institutionalized is originally determined by a graduated scale based on net taxable income as disclosed by the relative's last Federal income tax return.[25] The Court of Appeals held that the criterion selected—that of net taxable income for Federal tax purposes—did not accurately reflect a relative's ability to pay. Reasoning that the legal economic incentive provisions in the Internal Revenue Code would reduce a taxpayer's net taxable income without affecting his ability to support an institutionalized retarded person, the Court held

---

[25] The schedule is reproduced in the opinion of the Court of Appeals, 18 Mich App 145.

that keying PA 1965, No 335, to the relative's net taxable income did not reasonably fulfill the purpose of the act, and thus violated the constitutional guaranty of equal protection of the laws.

The finding that a given classification could, in certain limited instances, operate without complete uniformity and not fulfill the purpose for which a statute was enacted is not in itself dispositive of the question of its constitutionality. Reasonableness of a legislative classification is not dependent on complete equality in application of the chosen standard. "It is true that perfection is by no means required under the equal protection test of permissible classification." *Phillips Chemical Co.* v. *Dumas Independent School District* (1959), 361 US 376, 385 (80 S Ct 474, 4 L Ed 2d 384). Those conditions which usually and ordinarily exist measure the reasonableness of the criterion selected. *Pasadena City High School District* v. *Upjohn* (1929), 206 Cal 775 (276 P 341, 63 ALR 408). The existence of minor inequalities over a class does not amount to arbitrariness in the classification: "The 'rough accomodations' made by government do not violate the Equal Protection Clause of the Fourteenth Amendment unless the lines drawn are 'hostile or invidious.' " *Norvell* v. *Illinois* (1963), 373 US 420, 424 (83 S Ct 1366, 10 L Ed 2d 456).[26]

It cannot be said that a standard of net taxable income for Federal tax purposes as an approximate determinant of ability to pay is "entirely arbitrary."

---

[26] The point is carefully made in the dissenting opinion in the Court of Appeals: "The plaintiffs have not demonstrated, nor is there any evidence that the use of Federal taxable income as the 'original' and maximum basis for determining liability to make reimbursement under this act has permitted particular parents to avoid or disproportionately reduce their reimbursement liability, *let alone that this has occurred in such a significant number of cases as would justify this Court's conclusion that the legislatively selected criterion is unconstitutional.* * * *" (Emphasis added.) 18 Mich App 160.

*Fox* v. *Employment Security Commission, supra.*
Nor is there lacking a reasonable relationship between the purpose of the act and the classification chosen. The mere possibility that a few wealthy citizens could, availing themselves of the economic incentive provisions of the Internal Revenue Code, reduce their net taxable income thus understating their ability to pay for purposes of reimbursement under this statute, does not, under the authorities above-cited render the criterion selected arbitrary and violative of equal protection.[27]

Another factor supports a finding that there is no denial of equal protection of the laws in the provisions of PA 1965, No 335. According to the provisions of § 8 of the Act, monthly liability is only "originally determined" by using net taxable income; § 10 of the act expressly provides that if a relative believes that his ability to pay is not fairly reflected by his net taxable income as shown on his last Federal tax return, he may request a redetermination of his liability by the Department of Revenue, which may "request the relative to supply all relevant financial information and such additional information as may be provided by rules of the department of revenue." Only after review of this additional information may the amount of monthly liability be then determined.[28] Thus any inequality

---

[27] See Judge Levin's dissenting opinion, 18 Mich App 160: " * * * Important legislation should not be declared unconstitutional on theoretical grounds. 'The point is that lack of equal protection is found in the actual existence of an invidious discrimination [citations omitted], not in the mere possibility that there will be like or similar cases which will be treated more leniently.' *Queenside Hills Realty Co., Inc.* v. *Saxl* (1945), 328 US 80, 84, 85 (66 S Ct 850, 90 L Ed 1096)."

[28] The effect of this provision in the statute is to ensure that ability to pay will determine the amount of monthly reimbursement charged. See Judge Levin's dissenting opinion: "The standard on review, the parent's current income status and ability to pay, is *clearly enunciated as the controlling guideline.*" 18 Mich App 145, 161, 162. The

resulting from the original determination of liability could be minimized by the redetermination expressly provided for in § 10 of the act.

When the classification chosen is germane to the object of the legislation and constitutional requirements are complied with, judicial deference to the legislative determination should result in sustaining the legislation.

I would hold that the act as a whole satisfies the minimum constitutional requirements of equal protection since it produces generally fair results and establishes a classification which bears a reasonable relationship to the object of the enacted legislation.

## III

### DOES THE STATUTE VIOLATE DUE PROCESS IN FAILING TO ALLOW FOR A HEARING PRIOR TO A DETERMINATION OF LIABILITY?

Plaintiff contends that the act violates procedural due process in not giving a relative liable under the act a formal hearing to determine his liability before that liability is imposed. While any responsible relative dissatisfied with the original determination of his liability may request a redetermination of that

---

responsible relative under the act, if dissatisfied with the amount of monthly liability, may ask for a redetermination of that liability by the Department of Revenue; may appeal such a redetermination to the probate court; may take appeals from the decision of the probate court "as in other cases". Section 10. At each step the relative's *ability to pay* the reimbursement amounts *originally determined* on the basis of net taxable income, is controlling. The act makes ample provisions for remedying any minor discrepancies in ability to pay as between responsible relatives which are not reflected in the net taxable income figure. Thus the provisions of the act when taken as a whole would accurately and fairly determine monthly liability and comport with the requisites of equal protection of the laws. Further, since "ability to pay" is the controlling standard and the act incorporates numerous procedural safeguards to protect against arbitrariness, the assertion in the majority opinion, *ante* at p 307, that the Department of Revenue "operates with an uncontrolled discretion" in redetermining liability is wholly unpersuasive.

liability by the Department of Revenue, such a request does not constitute in any sense the hearing generally deemed necessary to comply with due process requirements. But absence of notice and hearing before an administrative agency prior to a determination of liability by that agency does not contravene constitutional due process requirements when property rights are involved.

Many cases have reasoned that provision for *de novo* judicial review supplies administrative procedural deficiencies.

In *Ewing* v. *Mytinger & Casselberry, Inc.* (1950), 339 US 594 (70 S Ct 870, 94 L Ed 1088), the United States Supreme Court held that an ultimate right to a hearing is sufficient to satisfy procedural due process:

" 'Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry *before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and judicial determination.* * * * ' (Emphasis added.)"

In *Phillips* v. *Commissioner of Internal Revenue* (1931), 283 US 589 (51 S Ct 608, 75 L Ed 1289), the United States Supreme Court, speaking through Mr. Justice Brandeis, said:

"Where only property rights are involved, *mere postponement of the judicial enquiry is not a denial of due process,* if the opportunity given for the ultimate judicial determination of the liability is adequate. * * * Delay in the judicial determination of property rights is not uncommon where it is essential that governmental needs be immediately satisfied." (Emphasis added.)

Similarly, in *Bourjois, Inc.* v. *Chapman* (1937), 301 US 183 (57 S Ct 691, 81 L Ed 1027), the Court

noted that the provision for an appeal from the determination of a registration board to a trial court cured any lack of notice and hearing before the administrative body.[29]   The Supreme Court of Oregon in *Mallatt* v. *Luihn* (1956), 206 Or 678, (294 P2d 871), in sustaining the constitutionality of their reimbursement statute which is very similar to the act in question, stated that *de novo* review cures any omission of a hearing in fixing the liability of relatives:

"While notice and an opportunity to be heard are of the essence of due process, it is not required that a hearing shall be given at any particular stage of the proceedings. It is sufficient if, before liability becomes final, the person whose rights are affected is given his 'day in court.' "

Thus it is not essential that a hearing be allowed before the making of an administrative determination if thereafter there is adequate opportunity for administrative or judicial review.   I note that the act expressly provides for a right to appeal any determination of liability by the Department of Revenue to the probate court.[30]   Responsible relatives may further appeal the determination of the probate court as in other cases.   Since the probate

---

[29] *Bourjois* did not explicitly hold that *de novo* judicial review is necessary to cure administrative procedural deficiencies; the Supreme Court held that due process was satisfied without even inquiring whether the review provision necessitated *de novo* review.   In *Bowles* v. *Willingham* (1944), 321 US 503 (64 S Ct 641, 88 L Ed 892), due process was found complied with even though the reviewing court's scope of review was extremely narrow.   Since both cases clearly affirm that when property rights are involved, provision for *de novo* judicial review comports with constitutional due process (even though an initial hearing is not provided for) and since I construe the instant legislation as providing for *de novo* review in the probate court, it is not necessary to consider whether administrative procedural deficiencies may be compensated by judicial review which is not *de novo* or determine whether provision for *de novo* judicial review marks the constitutional minimum.

[30] See fn 11, *supra.*

court is not in any sense an appellate court, I construe the word "appeal" as used in the statute to mean a trial *de novo* in the probate court.[31] Nor does the statute limit the issues which an aggrieved person can present to that court. An appeal of the revenue department's determination of liability to the probate court with opportunity for *de novo* judicial review would allow the relative to raise any issue having a direct bearing on the correctness of the administrative determination of liability— thus including the question of the existence of a liability relationship in the first instance.

*Trellsite Foundry & Stamping Company* v. *Enterprise Foundry* (1961), 365 Mich 209, does not compel a different result. *Trellsite* involved an apportionment proceeding under the Workmen's Compensation Act between former employers. This Court held that the apportionment provision of the statute denied the former employer procedural due process, since only subject to rights of appeal, his liability would be *conclusively determined* without an opportunity for a hearing. The instant case is clearly distinguishable from *Trellsite, supra,* in that existing provisions of the statute allow a dissatisfied

---

[31] See 2 Am Jur 2d, Administrative Law § 702, p 603, citing cases which have held that a provision for appeal may in itself be regarded as contemplating a trial *de novo.* Since the *Ewing-Phillips-Bourjois* trilogy of United States Supreme Court decisions stands unequivocally for the proposition that, when property rights are involved, procedural due process is satisfied if there is a right to a hearing at any stage of the proceedings, it is specious to contend, as does the majority opinion, that this legislation is defective in not providing for *notice* of hearing, since the statute explicitly provides that the *responsible relative* may (1) request at any time a redetermination of liability by the Department of Revenue, and (2) appeal to the probate court after such redetermination. See fn 11, *supra.* Since the relative must take affirmative steps to initiate either proceeding (but may do so *as of right* once his liability has been *originally* determined) provision for notice to the relative is obviously unnecessary. The schemata in effect prevents rights from being conclusively determined without the knowledge of the relative, the very evil the notice requirement is designed to prevent.

responsible relative, after notification by the Department of Revenue of its determination of his liability, to pursue an appeal to the probate court which will then finally determine such liability, at which time any issues germane to such a determination may be raised by the relative, including that of the existence of the requisite liability relationship under the act.

The statute makes ample provision for judicial review of the initial administrative determination of liability, and I would hold that the availability of such review cures the initial denial of an administrative hearing and satisfies procedural due process requirements.

## DECISION

Finding no merit in the other arguments raised by plaintiffs, I would uphold the constitutionality of this legislation, as against the reasons assigned by these plaintiffs for an opposite holding.

T. G. KAVANAGH and WILLIAMS, JJ., concurred with T. E. BRENNAN, J.